JOAN BERNARD ARMSTRONG, Chief Judge.
 

 | iPlaintiffs-appellants, Mr. and Mrs. Adam Thomas, Sr., et al., appeal a judgment denying their request for class action certification against the defendants-appel-lees, Exxon Mobil Corporation (“Exxon”) and Chalmette Refining, L.L.C. The original petition was filed on December 5, 1990, on behalf of residents of Algiers, but residents of St. Bernard parish were added as a class by a later supplemental and amending petition. Murphy Oil Corporation and Calciner Industries, Inc. were dropped by the plaintiffs as defendants when the Louisiana Supreme Court rendered its decision denying class action certification in
 
 Ford v. Murphy Oil, U.S.A., Inc.,
 
 96-2913 (La.9/9/97), 703 So.2d 542, a case with a lot in common with the instant case.
 

 The plaintiffs allege personal injury and property damage resulting from emissions (flaring) from petrochemical facilities operated by the defendants over a period of years beginning on January 1, 1989, and running to 2003. The defendants in this case are charged with basically the same emissions issues they were charged with in the
 
 Ford
 
 case.
 

 While the petition and amended petition allegations cover emissions from 1989 to 2003, the plaintiffs submitted approximately 7,000 claims forms from | ^potential class members for alleged pollution emissions from 1990 to 1997, but specifically January 19,1996. However, the claim forms do not specify on what dates any of the purported class members may have suffered from any one or more of the types of damage allegedly suffered by the class. The forms merely ask the class members to check off from a list of possible damages they allegedly sustained during the years 1990 to 1997. We cannot tell on which date or dates the claimants may have allegedly sustained the damages checked off and it is not credible to believe that all potential claimants suffered from the damages they checked off on each of the emission dates called for in the class action petitions.
 

 The putative class action representatives in the instant case were also part of the putative class in
 
 Ford,
 
 among them being the same Mr. Ford for whom the
 
 Ford
 
 case is named. Mr. Ford was the only one of the class representatives to testify on behalf of the St. Bernard class in the instant case.
 

 As we will explain in the following analysis, we find that the instant case is afflicted with the same impediments to class action certification that the Louisiana Supreme Court found to be most material in
 
 Ford.
 

 While the plaintiffs attempt to distinguish
 
 Ford,
 
 we find that
 
 Ford,
 
 while not identical in all respects to the instant case,
 
 *9
 
 reaches many conclusions that really cannot be distinguished from the case now before this Court and are determinative to the outcome of this case. The following pronouncements in
 
 Ford,
 
 which we find to be the foundation of the Louisiana Supreme Court’s decision in that case, are equally applicable and compelling in the instant case:
 

 The court of appeal made the following erroneous crucial finding based on
 
 McCastle
 
 that “[o]ffering the same facts, all class members will attempt to establish that the activities of Mobil and Murphy emitted hazardous, toxic, corrosive, or noxious odors, fumes, gases or particulate ^matter that caused them damage. The issue of these defendants duty predominates over individual questions.” 681 So.2d at 407. However, far from offering the same facts, each class member will necessarily have to offer different facts to establish that certain defendants’ emissions, either individually or in combination, caused them specific damages on yet unspecified dates (which dates may run into the hundreds or even thousands). The causation issue is even more complicated considering the widely divergent types of personal, property and business damages claimed and considering each plaintiffs’ unique habits, exposures, length of exposures, medications, medical conditions, employment, and location of residence or business. In addition, each plaintiff will have to prove that the specific harm he suffered surpassed the level of inconvenience that is tolerated under C.C. art 668. [FN11 omitted.] By the very nature of the claims that have been made, the length of time involved, and the vast geographical area in which the class members live, the degree of inconvenience or damage suffered will vary greatly as to the individual plaintiffs. Lastly, the mere finding of “defendants duty” not to pollute will do little to advance the issues in this case. There appear to be far too many individual liability issues which could not be tried separately, as that is prohibited by article 593.1(C)(1). As aptly stated by Judge Schott in his dissent, “[o]ne plaintiff cannot prove individual causation and individual damage based on the exposure of another plaintiff to a particular emission.” 681 So.2d at 411.
 

 Id.,
 
 96-2913, 96-2917 & 96-2929, pp. 11-12, 703 So.2d at pp. 548-549.
 

 While the
 
 Ford
 
 court went on to find that the “[pjlaintiffs ‘synergy theory’ is novel and untested,” we conclude from our reading of
 
 Ford
 
 that the “synergy theory” was not material to the Court’s decision in
 
 Ford.
 
 We find that the factors material to the Court’s decision to reject class action status in
 
 Ford
 
 was instead based on the problems quoted above. Thus, the mere recasting of the complaint in the instant suit to eliminate the “synergy theory” is insufficient to overcome the major and most material objections raised in
 
 Ford
 
 which are also to be found in the |4instant case. The following findings of the trial court in this case echo the language of
 
 Ford:
 

 Mr. and Mrs. Thomas complained of having experienced several different alleged symptoms as a result of exposure during releases, there are many class members who allege experiencing one, two or no symptoms at all as a result of the releases. Neither Mr. and Mrs. Thomas, nor any of the other class representatives who testified at the Class Certification Hearing, have the same habits, lifestyle, medical history, medication, location and/or overall exposure as the other proposed class members. Plaintiffs have not met their burden of proving adequacy of representation, commonality and typicality in accor
 
 *10
 
 dance with Louisiana code of Civil Procedure Articles 591-592.
 

 The trial court found that the “class members are too diverse for the class representatives to adequately protect the absent members.” In denying the plaintiffs’ motion to certify the class, the trial judge stated in his judgment, which included reasons for judgment, that, “the Court adopts and supports in toto the Special Master’s Report and Recommendation ...” The plaintiffs argue that there are errors in the Special Master’s Report sufficient to compel this Court to reverse the judgment of the lower court. However, as the trial court did not simply adopt the Special Master’s Report and Recommendation as the judgment of the court, but instead issued its own written reasons for judgment, errors in the Special Master’s Report, if any, cannot alone serve as a basis for reversing the judgment of the trial court. Moreover, the record itself shows that iti is impossible to distinguish the instant case from
 
 Ford,
 
 regarding the factors that the Supreme Court found to be most material to its decision to reverse the certification of the class in that case.
 

 The result reached by the Special Master in the instant case was based on the following conclusions:
 

 [5Most of the factors that persuaded the Supreme Court of Louisiana to reject class certification [in
 
 Ford
 
 ] are present in this case:
 

 1.) the proposed class members will have to offer different facts to establish that certain emissions, either individually or cumulatively, caused them specific damages on specific dates;
 

 2.) the causation issue requires consideration of the widely divergent types of personal, property and business damages claimed and requires consideration of each plaintiffs unique habits, medical history, exposures, length of exposures, concentration of chemical substances, medications, medical conditions, employment and location of businesses and residences;
 

 3.) each plaintiff will have to prove that the specific level of harm suffered surpassed the level of inconvenience tolerated under Louisiana Civil Code Art. 668;
 

 4.) the length of time involved spans from 1989 to at least 2003;
 

 5.) the proposed class members live in two large geographic areas; 6.) the degree of inconvenience or damage suffered will vary greatly as to individual plaintiffs;
 

 7.) a finding of the defendant’s duty not to release chemicals in excess of the permitted levels will do little to advance the issues in this case;
 

 8.) there are other sources of identical compound chemical substances complained to have caused the harms;
 

 9.) there is no uniformity in the claims of liability and damages.
 

 Adam Thomas, Gwendolyn Thomas, Consuella Cromedy and Willie Cromedy gave live testimony before the Special Master as representatives of the Algiers class.
 

 Adam Thomas testified that he lived in the area since 1972. He and his wife have run a pre-school out of his home in the Algiers area across the river from the EXXON refinery. At the time he gave his testimony to the Special Master on February 7, 2007, he stated that he suffered from high blood pressure and heart | ¿problems which were first diagnosed in 1995. His attorney questioned him about these symptoms:
 

 Q. As far as your condition, this high blood pressure'; do you know
 
 *11
 
 whether or not it was caused by the releases, any kind of pollution that’s released into your neighborhood from the ExxonMobil plant.
 

 A. No, I don’t.
 

 Q. Has any doctor ever told you that it was because of that?
 

 A. No.
 

 However, this is inconsistent with testimony he gave earlier in the hearing when his attorney asked him about his blood pressure:
 

 Q. You mentioned your blood pressure. How do you know that — let me ask you this; is your blood pressure affected when you smell that sul-phur smell?
 

 A. Yes.
 

 He was the class representative in previous EXXON litigation and testified that he was familiar with his neighborhood and things that might impact it and his neighbors as he was both politically and socially active in the area. He testified that he and his neighbors had headaches, runny eyes, runny nose and sore or dry throats allegedly attributable to EXXON discharges. He described the EXXON flare as emitting a sulfurous odor, but that he did not smell something every time the flare went off. He was asked:
 

 Q. And what reaction do you have when you smell that smell?
 

 A. I have a fearful reaction. I’m ready to cover up. See what it is out there.
 

 [[Image here]]
 

 A. Well it frightens me a lot. It shakes me up.
 

 He further testified that he feared that he might develop a fatal cancer and that there might be “a big explosion.” He also experienced the physical symptoms 1 described previously. He explained that all of his symptoms, which would include both physical symptoms and emotional distress lasted for two to three days after a flare that affected his neighborhood.
 

 He testified that the flares emitted an oily residue that would get on his roof, cars and lawn and had killed his flowers. He opined that he lived closest to the EXXON plants of almost any member of the purported class, only two streets away from the river across from the EXXON plant:
 

 Q. Now, other people in your class live much farther away, blocks and in some cases miles away; don’t they?
 

 A. Yes, I imagine.
 

 Q. Now, how their property was impacted, how much oily particle was on their property might be quite different from what was on yours; correct?
 

 A. That’s correct.
 

 Mr. Thomas admitted that he had no idea how people blocks away might have been impacted.
 

 Defense counsel stipulated numerosity, but not typicality and commonality.
 

 Mr. Thomas expressed the opinion that the chemical releases of the EXXON plant had so adversely impacted his home property value that he would be unable to sell his house, but he had made no attempt to sell the property and offered no reason or evidence in support of his opinion or whether any one else might share his opinion.
 

 Mr. Thomas’s wife, Ms. Gwendolyn Thomas, also testified as a putative class representative. She testified that the flares caused what she referred to as “soot” and thick black smoke, along with a smell like rotten eggs. She testified that she did not allow the day care center children to play outside on days when the
 
 *12
 
 EXXON plant was flaring. She complained of symptoms affecting, “My eyes, my | ¿nose, my sinus, I get dizziness, short of breath. Sometimes I can taste it in my mouth.” She said that as to her general health she had high blood pressure and sinus trouble, but did not attribute them to EXXON discharges. She complained that the flaring caused her to become nervous and dizzy and that her sinuses would become “real infected.” She testified that she would become “frightful” and was afraid that she would get cancer.
 

 She further testified that regardless of which way the wind blew on a particular day, she always smelled the flares. She testified that none of the children in her day care center had ever passed out or complained of dizziness and when first asked if any had thrown up she couldn’t remember, but subsequently testified that: “I guess sometimes, but not often.” She concluded this topic by agreeing that different releases would affect different children differently on different days. She testified that she did not know whether other members of the class would consider the flares to be a mere inconvenience. She admitted that other people in the neighborhood who did not suffer from high blood pressure as she did would be affected differently from the way in which she was affected. Plaintiffs’ counsel then posed the following questions to her:
 

 Q. As far as the times when you react to it and you have those physical reactions to it; is it your understanding that that causes your problems?
 

 A. Yes.
 

 Q. Is that only an inconvenience to you?
 

 A. Yes, it is.
 

 On re-cross-examination, Ms. Thomas explained that her symptoms varied from flare to flare.
 

 |c|Ms. Consuela Cromedy, age 58, lived in the putative class Algiers geographic area for thirty-five years and had spent a number of those years working at the Rosen-wald school in the area. When asked if she had “any ongoing medical condition at present,” her response was: “Sinus. High blood pressure.” She explained that in 1984 she had had a “serious operation on my sinus,” but that she still suffered with the sinus condition. She testified that whenever there was a flare, “Well, I get fearful, nervousness.” She could feel vibrations in her home. She compared the odor to raw eggs, sulphur, and sewerage. She testified that:
 

 [I]t makes me, first with a headache, dizzy, irritate my eyes, my throat, and it makes me short of breathing.
 

 She testified that her blood pressure went up when there were flares. She testified that the odor could last for three days. She says she experiences flare events approximately five times a year. When asked how she reacted mentally and emotionally to the flare events, she replied:
 

 Well, I’m very nervous. I[am] fearful. Fearful that I’ll go get cancer in the near future from this Mobil.
 

 However, she did not explain why she continued to fear the imminent onset of cancer when she had been allegedly exposed to the same carcinogen for so many years without ever having contracting cancer. She testified on cross-examination that in one of the years in question that for “365 days, 24 hours a day, [she] never left the neighborhood.”
 

 At one point in her testimony she testified that other people she had spoken to had the same complaints she had, but concluded her testimony with the statement: “To be honest with you I haven’t spoke[n] to no [sic] one. Okay?”
 

 
 *13
 
 Her husband, Willie Daniel Cromedy, Jr. was the next to testify. They married thirty-eight years ago, before they moved into the neighborhood thirty-five |inyears ago. He was on disability at the time he testified because of Syncope which caused him to have fainting spells. He testified that he could see the flares from his home and that when they occurred they could last for a couple of hours or, “Sometimes less, 30 minutes.” He, too, complained of the rotten egg smell, sulfurous smell, “and then right after you get, it looks like spots just all over your house, your car. Leave all oil spots. Gets on the windshield wiper when you cut them on you can’t see how to drive down the street from it.” He testified that it did not matter which way the wind blew, the results were always the same. Like his 'wife he testified that the odor lingered for more than a day after the flare. He further testified that:
 

 I get the headaches, you know, the nose, can’t hardly breathe, sore throat, and the pressure.
 

 Mr. Cromedy was prescribed medication to deal with the effects. When asked how long after being exposed to the smell he continued to feel the effects he responded: “Continual. Continual. Ain’t gonna go away.” He went on to testify that he feared, “Dying from it down the road,” and that, “I wonder when the big one gon [sic] hit. When the big bang might kill us, the down fall, you know.” He complained that:
 

 Lil [sic] black stuff falls all over the house, on my car. I have to wash my house down and wash my car. I have to wash my house down and wash my car.
 

 For part of the period of time in question he would be out of the neighborhood making deliveries for his trucking company job until 1998. He testified that he was a smoker but that none of his doctors had ever told him that smoking was bad for his health.
 

 |nMr. Kenneth Edward Ford, was the last putative class representative to give live testimony before the Special Master. At the time he testified he was living in a FEMA trailer because his home in St. Bernard was devastated by hurricane Katrina. He retired on disability as an Air National Guard non-commissioned officer in 1972 because of vascular problems with his thoracic artery. He testified that his home was approximately three thousand feet from the flare. He described the odor as “obnoxious” and “the smell is like hydrocarbons,” like that of rotten eggs. He said that sometimes the odor was “sweetish” and that the “sweetish” smell was alright. He testified that “we couldn’t open our windows plenty times because the odor was so obnoxious.” However, he did not know what long term health effects it might be having on him. Short term, he complained that his eyes would water and his nose would run and that it might also cause itching. He said once he got red in the face and, “I think I went to the hospital and they examined me.” However, he did not say what the results of the hospital examination were.
 

 Mr. Ford also complained of “a black soot, like carbon. If you smear it, it’s just nasty. You can’t rub it off, you’ve got to wash it off.” He complained that sometimes it would scratch his car when he tried to rub it off because it was like sand. He also complained that he hired professional cleaners to clean his house and that the power washing discolored his bricks and loosened mortar which resulted in stains. He had to change his carpets several times because of tracking the residue into his house.
 

 He felt that because he was retired he was probably home more than many people in the neighborhood.
 

 
 *14
 
 |12In addition to his problem with his thoracic artery, he also had had a lung removed five years prior to testifying as well as bladder cancer. He feared that the emissions could cause him long term health problems.
 

 He testified that although he was suing in this case for specific dates for emissions that supposedly were different from the emissions he was suing Murphy for in
 
 Ford v. Murphy,
 
 he was suing for the cumulative effect of emissions in both cases, thereby as a practical matter making it unrealistic to try to separate out the effects of the Murphy emissions.
 

 He testified that he felt that the EXXON emissions caused a loss of value to his home because “a lot of people don’t want to live close to a refinery.”
 

 The trial judge cited
 
 Davis v. American Home Products Corporation,
 
 02-942, pp. 13-20 (La-App. 4 Cir. 3/26/03), 844 So.2d 242, 254-258, for the propositions that “a class action may be certified only if numer-osity, typicality, adequacy of representation and commonality requirements are met; the burden of proving the existence of these three elements falls on the plaintiffs; and that the class is definable.
 

 The trial court cited
 
 Johnson v. Orleans Parish School Board,
 
 00-0825 (La.App. 4 Cir. 6/27/01), 790 So.2d 734, for the proposition that adequate representation of absent class members requires that proposed class representatives prove that their claims are a cross-section of or typical of the claims of all class members. The trial court found that: “None of the class representatives proved that they suffered any of the prerequisite injuries either physical, emotional, inconvenience or property damage necessary to meet the typicality. [Sic]” We find no manifest error in this finding.
 

 | i,A trial court’s decision regarding class certification is reviewed under a manifest error standard and an abuse of discretion standard as such a decision involves both a consideration of whether a factual basis exists to certify the class and the exercise of the trial court’s discretion in deciding if certification is appropriate.
 
 Gudo v. Administrators of Tulane Educational Fund,
 
 06-1515, pp. 3-4 (La.App. 4 Cir. 9/5/07), 966 So.2d 1069, 1073,
 
 writ denied,
 
 972 So.2d 1170 (La.1/11/08).
 

 The trial judge “must be afforded wide latitude when making factual and policy determinations as to the appropriateness of a class.”
 
 Chamberlain v. Belle of Orleans,
 
 98-1740, pp. 3-4 (La.App. 4 Cir. 4/7/99), 731 So.2d 1033, 1035;
 
 Doerr v. Mobil Oil Corp.,
 
 01-0775, p. 8 (La.App. 4 Cir. 2/27/02), 811 So.2d 1135, 1142. Moreover, this Court has characterized the trial court’s discretion in deciding if certification is appropriate as “vast.”
 
 Id.
 

 The defendants make the statement in their brief that this case is governed by the pre-1997 version of the class action statute, La. C.C.P. art. 591-592. The 1997 amendments, however, did not result in a substantive change to Louisiana class action law, as the changes had already been incorporated into class action jui'ispru-dence. Do
 
 err, supra,
 
 01-0775, p. 8, 811 So.2d at 1142;
 
 See also, Bourgeois v. A.P. Green Industries, Inc.,
 
 06-87 (La.App. 5 Cir. 7/28/06), 939 So.2d 478.
 

 The primary pre-1997 requirements were numerosity, adequacy of representation, and commonality.
 
 McCastle v. Rollins Envtl. Servs. Of La., Inc.,
 
 456 So.2d 612, 616 (La.1984).
 

 The plaintiffs offered several thousand claims forms to show numerosity. They covered a seven year time span and included many questions calling for |uvague, subjective answers. The testimo
 
 *15
 
 ny of the purported class representatives does not support a finding of manifest error or abuse of discretion. For example, Mr. and Mrs. Thomas testified to suffering from a certain group of symptoms, but an analysis of the claims forms shows that many claimants experienced only one or two of these symptoms and some experienced none of them. Based on the record before us we cannot say that the Special Master’s report which the trial court adopted was manifestly wrong in concluding that:
 

 In this case, based upon their own testimony, none of the class representatives can adequately represent the class. Each and every class representative has a separate, unique and individual history of exposures, none can prove that they were exposed to even a majority of the releases claimed to have caused injury, none of the class members have introduced even a scintilla of medical evidence to prove that they suffered a real as opposed to a hypothetical physical injury, and none of the class representatives possess first hand knowledge or experience of the wide ranging members of this class, which includes not only residents in the vicinity of the Chalmette Refinery from January 1, 1989, but also includes every person who operated businesses in the area, attended school or worked in the area, and/or who were merely present within the geographic area specified on any of the release dates. Consequently, the class definition itself excludes even the possibility that any class representatives could adequately represent the interests of all of the individuals included in the class certification.
 

 Of the putative class representatives, only Mr. and Mrs. Thomas owned a business in the ai’ea, and as it was a day care center operated for all practical purposes out of their home, it is unlikely to be representative of businesses in the area. Moreover, they did not testify that their business suffered in any way from the flaring events.
 

 Additionally, the record reflects that while the plaintiffs allege property damage as a class, they failed to offer any material evidence that they or any other | ^member of their class suffered any such damages or could adequately represent the class on that broad category of claim. They offered no testimony other than the expression of their general opinion that their property values had been adversely affected based on nothing more than their opinion.
 

 Moreover, the Special Master noted that “the class representatives cannot provide testimony that the level of harm by each class member surpassed the level of harm tolerated under [La. C.C.] Art. 668, required to establish damages for a nuisance claim,” similar to the finding made by the Supreme Court in
 
 Ford, swpra,
 
 pp. 11-12 & FN. 11, 703 So.2d at 549. Different members of the putative class live at widely divergent locations dispersed over distances ranging from close by to several miles away inevitably resulting in much different levels of exposure. Different members of the putative class may have lived in the area for most or all of the time period covered by the alleged exposure to the noxious emissions, while others have lived there for only a relatively short period of time resulting in much different levels and frequencies of exposure. Furthermore, each class representative admitted that as to all of these issues of extent of exposure and what effect such exposure may have had, he or she could only testify on a personal basis and could offer no insights or evidence regarding other members of the putative class concerning such issues, thereby supporting a finding of no
 
 *16
 
 manifest error and no abuse of the trial court’s discretion in denying class certification.
 

 There were over 200 emission events alleged to have occurred over a period of 14 years. During that period of time there are just too many variables as to how various putative class members may have been exposed or affected that need to be resolved on an individual basis to allow for a workable class. A common question is defined as one which when answered as to one class member is answered as to |inall of them.
 
 Davis v. American Home Products Corp.,
 
 02-0942, p. 14 (La.App. 4 Cir. 3/26/03), 844 So.2d 242, 254. As in
 
 Ford,
 
 “the mere finding of ‘defendants duty’ not to pollute will do little to advance the issues in this case.”
 
 Id,.,
 
 96-2913, p. 12, 703 So.2d at 549. “If this [case] were to proceed as a class action, [it] would quickly disintegrate into unmanageable multitude of small suits with individual issues and evidence, violating the policy of judicial efficiency which the class action is designed to serve.”
 
 Brown v. New Orleans Pub. Serv., Inc.,
 
 506 So.2d 621, 624 (La.App. 4 Cir.1987).
 

 Likewise, plaintiffs expert, Dr. Mehl-man, did not consider variables such as the fact that many putative plaintiffs lived in the area for differing lengths of time and that there were other petrochemical plants in the area in addition to those of the defendants herein which were emitting as much or more of the allegedly noxious fumes into the area. Dr. Mehlman relied on the plaintiffs’ claim forms, but could not tell from those forms who was exposed to what substances on which days, for how long or in what quantity. He admitted that it is likely that most people in the New Orleans area would have experienced the symptoms listed on the claim forms at some point during the seven-year period inquired about, even if they were not exposed to any substances released by Exxon or any other individual facility. Dr. Mehlman also admitted that the claims of plaintiffs who only checked one listed symptom would be suspect, yet he did not make an effort to exclude such persons from his analysis. Moreover, the fact that a number of putative class members checked no symptoms supports a finding that there is no commonality among the class members as to their individual claims.
 

 Additionally, Dr. Mehlman gave testimony that shows how weak the claim to class action status is, especially as regards residents of St. Bernard Parish:
 

 [17Q. You’re sitting here as a scientist and you are willing to opine people in St. Bernard Parish were exposed to [sulfur dioxide] based upon the testimony of three class representatives out of the thousands of people over there? That’s enough evidence for you to come to this conclusion?
 

 A. What I have seen is the people in that transcript identify the same— but, right, only three. That’s all I saw.
 

 Q. That’s good enough for you?
 

 A. No. That’s all I saw. That’s all I can say. The people [who] gave testimony have identical symptoms. That’s all. And they happen to be from St. Bernard. I didn’t realize that when I was reading. I thought they [were] all part of the same, of Algiers.
 

 Q. Now, given that you rely on air modeling; do you know where St. Bernard is located vis-a-vis, where Algiers [is] located in relation to the claim? Are they in different directions from one another?
 

 A. Yes. They are on the same side as the EXXON Mobil Refinery. Algiers is ... across the River.
 

 
 *17
 
 Q. So they’re different. The wind would blow the [sulfur dioxide] different directions on the different times; would you agree with that?
 

 A. On different days, yes.
 

 Q. And you can’t tell me who was exposed to what, on which days, for how long, or how much; can you?
 

 A. No, I can not.
 

 This Court has no basis for finding manifest error or abuse of discretion in the findings of the trial court based on the record before us.
 

 Regarding emissions by other plants in the area, the plaintiffs, cite
 
 West v. G. & H. Seed Co.,
 
 01-1453 (La.App. 3 Cir. 8/28/02), 832 So.2d 274, for the proposition that, “The case law holds that the fault of others, if any is an issue for damages and not liability.” However, the facts in
 
 West,
 
 which involved a class of crawfish farmers who allegedly sustained damage from an insecticide, are not even remotely related to or analogous to those of the instant case. We find nothing in
 
 11AWest
 
 that suggests that the trial court in the instant case committed manifest error or abused its discretion.
 

 Plaintiffs’ air modeling expert, Dr. David Mitchell, designed his model based on a “worst case scenario” of emission events occurring in the years 1989-2003. Basing his analysis on the National Ambient Air Quality Standard, he testified that the standard was exceeded in only two of approximately 40 releases he modeled and that if he had used OSHA standards instead, there would be no releases of sul-phur dioxide exceeding permissible levels.
 

 Significantly, Dr. Mitchell, failed to include in his modeling other sources of the same pollutants that exceeded those of the instant defendants. While there is some dispute in the record about the levels of pollutants from other plants in the area, it stands to reason that if they emitted substantial amounts of the same pollutants complained of by the plaintiffs in the instant case, it must have contributed to the overall level of pollutants in the air even if the levels emitted by those other plants were within regulatory limits.
 

 In the final analysis, we find
 
 Ford
 
 to be controlling. We find that from a class action perspective the instant case in so. many material ways contains the same obstacles to class action certification that the
 
 Ford
 
 court found to be insurmountable under the facts before it as to be more than sufficient to prevent this Court from saying that the trial court’s denial of class action certification in the instant case was manifestly erroneous/clearly wrong or an abuse of discretion.
 

 For the foregoing reasons, the judgment of the trial court is affirmed.
 

 AFFIRMED.
 

 BONIN, J., dissents and assigns reasons.
 

 BONIN, J., dissents and assigns reasons.
 

 hi respectfully dissent. As our court noted in
 
 Andry v. Murphy Oil,
 
 97-0793, p. 2 (La.App. 4 Cir. 4/1/98), 710 So.2d 1126, 1128-29:
 

 A class action is no more than a procedural device; it confers no substantive rights.... The only issue to be considered by the trial court in ruling on certification, and by this Court on review, is whether the case at bar is one in which the procedural device is appropriate. In determining the propriety of a class action the court is not concerned with whether the plaintiffs have stated a cause of action or the likelihood that they ultimately will prevail on the merits.
 

 
 *18
 
 It is well understood that a class action is an imperfect and imprecise method for adjudicating competing rights. However, when each individual’s claim is small, disallowing class certification “pose[s] a serious threat to the loss of individual substantive rights if the class action is not allowed.”
 
 Williams v. State,
 
 350 So.2d 131, 135 (La.1977). The special master, and the trial court, improperly deviated from the realm of class certification and wandered into the merits of the claim.
 
 [1]
 

 |2The trial court, in my view, abused its discretion in failing to consider whether
 
 any
 
 class, other than only the one proposed by the putative class representatives could be certified. La. C.C.P. art. 592(A)(3)(c) provides that “[i]n the process of class certification, ..., the court ... may enlarge, restrict, or otherwise redefine the constituency of the class or the issues to be maintained in the class action.” The special master and the trial-court failed to consider sufficiently whether this class action lawsuit remedied the objections raised by the Louisiana Supreme Court in
 
 Ford v. Murphy Oil, U.S.A., Inc.,
 
 96-2913 (La.9/9/97), 703 So.2d 542. Chief Justice Calogero, in his concurring opinion in
 
 Ford, supra
 
 at 551, wrote to emphasize that
 
 McCastle v. Rollins Environmental Serv. of La.,
 
 456 So.2d 612 (La.1984) “is still good law.”
 

 Judge Peters’ analysis in his dissent from the Third Circuit’s holding in
 
 Bartlett v. Browning-Ferris Ind. Chem. Serv., Inc.,
 
 98-0341, p. 4 (La.App. 3 Cir. 12/9/98), 726 So.2d 414, 416-77, applies equally to this matter:
 

 To read
 
 Ford
 
 in such a restrictive way is to preclude certification of any class action tort suit. Citing
 
 Stevens v. Board of Trustees of Police Pension Fund,
 
 309 So.2d 144 (La.1975), the court in
 
 Ford
 
 made it clear “that the fact that different recoveries are sought, based upon the same factual transaction and same legal relationship” is not sufficient to defeat a class action.
 
 Ford,
 
 703 So.2d at 546.
 

 As pointed out by the majority, the decision in
 
 Ford
 
 was based on the fact that the plaintiffs were seeking recovery from four separate entities which operated four sources of pollutants. They asserted that these pollutants, individually or combined, caused the damages which were the subject of the class action request. The factors cited as controlling in denying class certification in that case are not present in this litigation. ...
 

 In
 
 McCastle
 
 the supreme court allowed a class action of 4000 people against the operator of a hazardous waste facility and the hazardous waste supplier. The supreme court pointed out in
 
 McCastle
 
 that “individual ^questions of quantum do not preclude a class action when predominant liability issues are common to the class.”
 
 Id.
 
 at 620. The court further concluded that “a pragmatic rather than formalistic review of the pleadings and the showing made herein clearly indicates that a class action would be superior to other available adjudicatory methods for effectuating substantive law, judicial efficiency and individual fairness in this case.”
 
 Id.
 
 at 621. Importantly,
 
 McCastle ivas not overruled in Ford; rather, Ford simply refused to extend McCastle to the broad facts before it.
 
 (emphasis added)
 

 In a Per Curiam decision on a writ grant to the Third Circuit, but following partial settlements and a report from the parties
 
 *19
 
 that on that account class action was no longer necessary, the Supreme Court noted:
 

 ... this Court was particularly concerned that the court of appeal committed an error of law in denying class certification based primarily on plaintiffs’ burden of proving damages. As we have made clear before and reiterate today, the mere fact that varying degrees of damages may result from the same factual transaction and same legal relationship or that class members must individually prove their right to recover
 
 does not
 
 preclude class certification, (emphasis supplied)
 

 Bartlett v. Browning-Ferris Ind. Chem. Serv., Inc.,
 
 99-0494, p. 3 (La.11/12/99), 759 So.2d 755, 756. This analysis of the proper reading of
 
 Ford
 
 is reinforced by the reasons given by Justice Johnson in her dissent:
 

 I believe the actions of the lower courts should be reversed and this matter certified as a class action. The lower courts’ reliance on
 
 Ford v. Murphy Oil ...
 
 was misplaced. The refusal to certify the class in
 
 Ford
 
 was based on the fact that recovery was sought from four separate entities operating four separate sources of pollutants. The plaintiffs averred that the pollutants, both individually and in combination, were the cause of their damages. Thus, class certification was denied.
 

 In my view, this case is distinguishable from
 
 Ford.
 
 Here we are dealing with one source of pollution rather than four, and the lower courts erred in using Ford as the |4basis for vacating class certification. This case is more closely akin to
 
 McCastle
 
 .... While the plaintiffs in
 
 McCastle
 
 sought varying degrees of damages, the Court stated that “individual questions of quantum do not preclude a class action when predominant liability issues are common to the class.”
 

 Id.
 
 at 620. Similarly, while there is some diversity in damages in the present matter, the plaintiffs should not be precluded from going forward to determine liability.
 

 Further, while the number of plaintiffs has decreased to approximately 270, the same dangers of inconsistent determinations and of earlier separate adjudications with prejudicial effect still exist.
 

 Id.
 
 at 757.
 

 This case, it seems to me, is a good faith attempt by the plaintiffs to limit the claims and the parties from their initial filing in
 
 Ford
 
 and achieve substantive justice. The
 
 Ford
 
 court specifically noted that its de-certification of the class “will not keep these plaintiffs out of court ... [because] individual actions, consolidated actions, or
 
 perhaps a more limited class action are still available.” Ford,
 
 703 So.2d 542, 549 (emphasis added).
 

 By completely denying class certification, without even attempting to apply the provisions of La. C.G.P. art. 592(A)(3)(c), these plaintiffs are, we all know, effectively put out of court.
 

 ... [I]t is a troubling proposition that a tortfeasor can be relieved of responsibility if its conduct produces minimal harm, albeit to many people. Surely a wrong that causes a hundred dollars of harm to ten thousand people is of no less concern than a wrong that causes a million dollars of harm to an individual. To declare the former harm
 
 de minimis,
 
 and not worthy of redress is to undermine the dual concerns of tort law: accountability for the wrongdoer and compensation for the victim.
 

 Doerr v. Mobil Oil Corp.,
 
 04-1789, p. 10 (La.App. 4 Cir. 6/14/06), 935 So.2d 231, 238. Therefore, I respectfully dissent.
 

 [1]
 

 . For example, the special master in conclusion of law # 8 reported: “The class definition requires a determination of the merits of the case, i.e. the ultimate issues of liability and causation.’’ The trial court adopted the report
 
 “in loto."