MAX N. TOBIAS, JR., Judge.
hln this consolidated action, the plaintiffs [1] appeal the judgment of the trial court rendered in favor of the defendants, University Healthcare System, LC. d/b/a Tulane University Hospital and Clinic (“Tulane”) and General Electric Company (“GE”), denying the plaintiffs’ motion for class certification on the ground that the plaintiffs failed to carry their burden of proving that class certification, under La. C.C.P. art. 591 et seq., is the proper procedural vehicle for maintaining this action. Finding no manifest error or abuse of discretion by the trial court, for the reasons that follow, we affirm.
FACTS AND PROCEDURAL HISTORY
This proposed class action involves claims against the defendants, Tulane and GE, for their alleged negligent failure to properly calibrate Tulane’s automated endoscope reprocessors (“AERs”) to the requisite sterilization temperature, exposing numerous hospital and clinic patients to the possibility of contracting infectious diseases. The plaintiffs assert claims pursuant to La. C.C. arts. 2315 and 2316 seeking compensation for injuries and damages due to the negligent infliction of emotional distress associated with their purported exposure to infectious | ¡.disease.[2] Additionally, the plaintiffs seek relief under La. C.C. art. 2317 on the ground that, at all times pertinent, Tulane and/or GE had custody, control, or garde of the AERs that purportedly caused their alleged damages.
*560 The facts are largely undisputed. Between 7 October 2010 and 1 December 2010, the plaintiffs presented to Tulane and underwent various endoscopic procedures, including bronchoscopies, colonosco-pies, sigmoidoscopies, gastroscopies, and other upper endoscopies of the stomach. These endoscopis procedures require utilization of a medical device known as an endoscope, which is a tubular instrument used to examine the interior surfaces of an organ or tissue. Because endoscopes enter body cavities and are repeatedly reused, the United States Center for Disease Control (“CDC”) mandates that they be subjected to high-level disinfection[3] using chemical disinfectants.
Tulane utilizes two Medivator DSD-201D AERs, referred to as Units “49” and “50,” manufactured by Minntech Corporation, which the hospital purchased on 16 June 2009 and installed in August 2009. Tulane entered into a “Services Agreement” with GE, under which GE was responsible for providing maintenance and repair services for clinical equipment at the hospital, including the two AERs Tulane purchased in June.
At all pertinent times, Tulane had in effect a policy regarding the “reprocessing” or sterilization of the Medivator AERs. The standard cleaning ^process for endoscopes involves a five-step process, with each step designed to thoroughly clean the endoscope. The last step involves soaking the endoscope inside the AER in a high level disinfectant solution for a specified period of time within a certain temperature range. Initially, Tulane programmed the endoscopic equipment to operate with a high-level disinfectant solution called Cidex OPA™ (“Cidex”). Pursuant to Minntech’s instruction manual, high-level disinfection for the AER, when utilizing Cidex, is achieved upon five minutes of contact at 25°C (77°F). Tulane’s internal policies and procedures require the reservoir temperature on the AERs to be set to at least 3°C higher than the disinfectant manufacturer’s recommendations. Accordingly, when using Cidex, Tulane’s AERs were required to be set at 28°C to properly perform disinfection.
On 7 October 2010, a GE employee, Thomas Steel, performed repairs to Unit 50, and was asked by a Tulane employee to change the high-level disinfectant in the endoscopic device from Cidex to a solution called RapicideTM. While the solution was changed as requested, the reservoir temperature on the AER remained unchanged at 28°C. Subsequently, on 26 October 2010, Mr. Steel performed repairs on the second AER, Unit 49, and, at the direction of Tulane, also switched the high-level disinfectant in Unit 49 from Cidex to Rapicide without making any changes to the reservoir temperature. In November 2010, Tulane personnel replaced the Rapicide solution in both Units 49 and 50, without changing the reservoir temperature settings.
The manufacturer of Rapicide instructs that high-level disinfection occurs upon five minutes contact at 35°C (95°F), which is seven degrees higher than the recommended reservoir temperature for Cidex. Moreover, pursuant to Tulane’s |4policies and procedures, Units 49 and 50 should have been set to reprocess the endoscopes three degrees higher than the manufacturer’s recommendations, or at 38°C. The error in the reservoir temperature settings *561 was discovered on 1 December 2010 by Joanne Harbaugh, the interim manager for Tulane’s endoscopy department, at which time both AERs were immediately adjusted to sterilize the endoscopic equipment at the appropriate temperature, 38°C, in accordance with Tulane’s policies and procedures.
On or about 3 January 2011, Tulane sent certified letters to approximately 366 patients who had undergone some type of endoscopic test at its facility between 7 October and 1 December 2010, and where scopes that were reprocessed with Rapi-cide at the lower temperature were utilized. The letter stated, in pertinent part:
Tulane Medical Center routinely follows a five-step procedure in processing endoscopes for use. Recently, during a routine maintenance inspection, we found that one of several steps used in disinfecting endoscopes for procedures conducted between October 7 and December 1, 2010 at our downtown facility was not being performed at the appropriate temperature as recommended by the manufacturer....
The letter further advised that, according to the Louisiana Department of Health’s Infectious Disease Epidemiology Section and other leading authorities on infection control standards, the potential risk of exposure to infection was “minimal to nonexistent.” Additionally, in order to reassure those patients whose procedures were impacted, the letter offered free screening for hepatitis B, hepatitis C, and HIV, as well as free post-test counseling and follow up.[4]
| sAccording to testimony in the record, some of the affected patients were actually notified of the temperature discrepancy by telephone and not as a result of reading the 3 January 2011 letter. Additionally, Tulane sent out subsequent letters at later dates to some of the patients. The record evidence indicates that some of the affected patients spoke to various Tulane employees both in person and by telephone after the letters were mailed. Moreover, evidence is present showing that some of the patients sought advice and screening from health care providers other than Tulane’s, who concurred that the risk of potentially contracting infection as a result of their endoscopic procedures was low, while other patients were not given such reassurances. The record further suggests that still other patients were told by health care providers and family members that their risk for contracting an infectious disease was much higher. Some patients, who claimed to have experienced little or no reassurance after the first negative screening, took advantage of additional testing and were reassured after receiving a second negative result. Still other patients have insisted upon undergoing three or four blood tests and believe additional tests are warranted. The record testimony also establishes that while all of the patients affected were afforded the opportunity for counseling, some patients availed themselves of the opportunity, yet others did not.
In February 2011, the first of eventually nine lawsuits naming a total of twenty plaintiffs was filed in the Civil District Court for the Parish of Orleans naming Tulane and GE as defendants. Of the nine lawsuits filed, some were filed as putative class actions, and some were filed as individual actions. Thereafter, the trial court appointed a Plaintiffs’ Steering Committee (“PSC”), and consolidated the nine cases for purposes of pretrial proceedings. In April and May 2012, ^respectively, the tri *562 al court executed a preliminary case management order (“CMO”) and then a second CMO governing putative class discovery.
The plaintiffs’ motion for class certification came for hearing on 19 September 2012. At that time, the plaintiffs sought certification of two, separate proposed subclasses: [5] (1) all individuals who underwent endoscopic procedures at Tulane from 7 October 2010 to 1 December 2010, and were notified of their potential exposure to infectious disease, but who did not actually contract an infectious disease;[6] and (2) all individuals who did not undergo endoscopic procedures at Tulane, but who, from 7 October 2010 to 1 December 2010, were married or in a sexual relationship with an individual defined in subclass (l).[7]
Following numerous joint stipulations entered into by the parties, which were admitted into the record, the plaintiffs presented the deposition testimony of each of the proposed class representatives, in addition to other plaintiffs. Additionally, the plaintiffs also introduced the deposition testimony and report of their medical expert, Dr. Charles Stratton, an infectious disease physician, who, based upon two case reports, opined that it was possible for a patient to contract an infectious disease from an improperly sterilized endoscope. During the hearing, live testimony was elicited from two defense experts: Dr. William Rutala and Dr. Richard Roniger. Dr. Rutala, a renowned expert in the disinfection of endoscopes, | -/testified regarding the risk of actual exposure to any viable blood borne pathogens as a result of an endoscopic procedure under the factual circumstances presented. Dr. Roniger, a local psychiatrist, detailed the broad spectrum of emotional distress that the different plaintiffs might potentially experience upon receiving the 3 January 2011 letter from Tulane, based upon each plaintiffs biological and psychological make-up and their respective life experiences, ranging from no significant adverse response to enduring potentially substantial anxiety. In lieu of his live testimony, the report of defense expert, Dr. Brobson Lutz, a local infectious disease physician, who regularly diagnoses, treats, and counsels patients potentially exposed to HIV, hepatitis B, and hepatitis C, was submitted by the defendants. The trial court further admitted into evidence various exhibits submitted by both the plaintiffs and the defendants. Following the hearing, the trial court took the matter under advisement and post-hearing memoranda were filed on behalf of both parties.
On 4 February 2013, the trial court rendered judgment denying the plaintiffs’ motion for class certification. Although the court determined that the plaintiffs’ claims satisfied the elements of commonality, typicality, adequacy, and an objectively definable class, the court concluded that the plaintiffs failed to carry their burden of proving the requisite elements of numerosity, predominance, and/or superiority.
| sFrom that judgment, the plaintiffs *563 timely filed a devolutive appeal[8] asserting the following assignments of error:
(1) The trial court erred in denying plaintiffs’ motion to certify for failure to meet the numerosity requirement of La. C.C.P. art. 591 based on a misapplication of this court’s prior reasoning set forth in Galjour v. Bank One Equity Investors-Bidco, Inc., 05-1360 (La.App. 4 Cir. 6/21/06), 935 So.2d 716, and because, under the stipulated facts,[9] controlling precedent triggers a presumption that joinder is impracticable.
(2) Under La. C.C.P. art. 591, the trial court erred in denying class certification for failure to meet the predominance requirement when, after finding that plaintiffs will present common proof on the elements of duty, breach, and common causation, it (a) erroneously reasoned that the individual class members’ sexual histories and/or “other possible mediums of exposure” would create “superseding, intervening causes” relative to their claims for negligent infliction of emotional distress, even though none of the proposed litigants asserted claims for actual contraction of an infectious disease, and (b) incorrectly relied upon out-of-state precedent that differs substantially from Louisiana law.
Conversely, the defendants aver that, after conducting the requisite analysis, the trial court’s factual findings were correct and existing law supports its refusal to certify the class because joinder is practicable and feasible. The defendants further aver that, even if the trial court was within its discretion as to only one of the deficiencies it found in the plaintiffs’ proof, its judgment must be affirmed.
| ^STANDARD OF REVIEW
In Price v. Martin, 11-0853, pp. 7-8 (La.12/6/11), 79 So.3d 960, 967, the Louisiana Supreme Court explained the standard of review to be applied by the appellate court when reviewing a trial court’s determination of whether to certify a class:
In reviewing a judgment on class certification, the district court’s factual findings are subject to the manifest error standard, which the court’s ultimate decision regarding whether to certify the class is reviewed under the abuse of discretion standard.[10] Brooks v. Union Pacific Railroad Co., 08-2035, p. 10 (La.5/22/09), 13 So.3d 546, 554. Whether the district court applied the correct legal standard in determining whether *564 to certify the class is reviewed de novo. Id., 08-2035 at p. 11, 13 So.3d at 554.
Louisiana courts are afforded vast discretion in determining whether to certify a class and the trial judge “must be afforded wide latitude when making factual and policy determinations as to the appropriateness of a class.” Thomas v. Mobil Oil Corp., 08-0541, p. 13 (La.App. 4 Cir. 3/21/09), 14 So.3d 7, 14.[11] | Accordingly, the trial judge’s decision should not be reversed absent manifest or legal error.
*565 DISCUSSION
In essence, a class action is nothing more than a procedural device as it confers no substantive rights upon the parties. When presented with a motion to certify, the trial judge’s consideration is limited to whether the procedural device is appropriate under the factual circumstances presented. Galjour, 05-1360 at 7, 935 So.2d at 723. In Doe v. Southern Gyms, LLC, 12-1566, p. 6 (La.3/19/13), 112 So.3d 822, 827-828 (citing Ford v. Murphy Oil U.S.A., Inc., 96-2913, p. 4 (La.9/9/97), 703 So.2d 542, 544), the Supreme Court stated the following:
[t]he class action is a nontraditional litigation procedure permitting a representative with typical claims to sue or defend on behalf of, and stand in judgment for, a class of similarly situated persons when the question is one of common or general interest to persons so numerous as to make it impracticable to bring them all before the court. See Herbert B. Newberg & Albe Conte, 1 Newberg on Class Actions, § 1.10, p. 1-2, 1-3 (3d ed.1992). The purpose and intent of class action procedure is to adjudicate and obtain res judicata effect on all common issues applicable not only to the representatives who bring the action, but to all others who are “similarly situated,” provided they are given adequate notice of the pending class action and do not timely exercise the option of exclusion from the class action.
In ascertaining whether a proposed class action meets the legal requirements, the jurisprudence mandates that the trial court engage in a “rigorous analysis,” which includes evaluating, quantifying, and weighing “the relevant factors, to determine to what extent the class action would, in each instance, promote or detract from the goals of effectuating substantive law, judicial efficiency, and individual fairness.” Brooks v. Union Pacific Railroad Co., 08-2035, p. 10 (La.5/22/09), 13 So.3d 546, 554 (citing McCastle v. Rollins Environmental Services of Louisiana, Inc., 456 So.2d 612, 618 (La.1984)[12]). In doing so, “the trial court must actively inquire into every aspect of the case and should not hesitate to require showings beyond the pleadings” to assist it in gaining a better understanding of the claims, defenses, relevant facts, and applicable substantive law so that a meaningful determination of the certification issue may be made. Brooks, 08-2035 at 10, 13 So.3d at 554; Dupree v. Lafayette Ins. Co., 09-2602, p. 7 (La.11/30/10), 51 So.3d 673, 680. While any error to be made in deciding class action issues should be in favor of, not against, maintenance of the class action, Brooks, 08-2035 at 10, 13 So.3d at 554, nevertheless, the trial court is afforded broad discretion when evaluating class certification issues, and has wide latitude in considerations involving policy matters, as well as those matters requiring a preliminary analysis of the facts. Davis v. American Home Products Corp., 02-0942, p. 6 (La.App. 4 Cir. 3/26/03), 844 So.2d 242, 249.
La. C.C.P. art. 591 A[13] contains the threshold requirements the party seeking *566 class certification must establish: numer-osity, commonality, typicality, adequacy of the representative, and an objectively definable class. The failure to meet even one of these threshold requirements is the death knell for class certification. Southern Gyms, 12-1566 at 6-7, 112 So.3d at 828. Once the threshold requirements of La. C.C.P. art. 591 A are met, Section 591 B [14] sets forth additional requirements the | isparty requesting class certification must satisfy. Alexander v. Norfolk S. Corp., 11-2793, p. 2 (La.3/9/12), 82 So.3d 1234, 1235. The parties agree that the applicable consideration in this case is set forth in Article 591 B(3), which states that the court must find “that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.”
1 uThe party seeking to maintain the class action bears the burden of proving that the statutory class certification criteria have been satisfied. Dupree, 09-2602 at 10, 51 So.3d at 682. In the instant case, the plaintiffs bore the burden of establishing that the requisite five elements set forth in La. C.C.P. art. 591 A — numerosity, commonality, typicality, adequacy of representative parties, and an objectively defin *567 able class — were met. Additionally, the plaintiffs were charged with proving that, in accordance with La. C.C.P. art. 591 B(3), all common questions of law or fact predominate over individual issues and that the class action procedure is superior to any other method for resolving the controversy fairly and efficiently. Price, 11-0853 at 9, 79 So.3d at 969. The trial court agreed that the plaintiffs established that the commonality, typicality, adequacy of the representatives,[15] and objectively defined class requirements had been satisfied. In denying class certification, however, the trial court determined that the plaintiffs failed to meet the numerosity requirement of La. C.C.P. art. 591 A. The trial court also held that the plaintiffs failed to show that common issues predominate over individual issues and that the class action is superior to other adjudicatory methods for fairly and efficiently resolving this controversy.
Applying the legal precepts outlined above, we now turn to the facts and circumstances presented by the instant case.

1. Numerosity

11fiTo satisfy the numerosity requirement, the party seeking certification must prove that the members of the class are so numerous that joinder is impracticable. La. C.C.P. art. 591 A(l). The key is “impracticality, and not impossibility of joinder.” 1 Frank L. Maraist and Harry T. Lemmon, Louisiana Civil Law Treatise: Civil Procedure § 4.12 (1999). Without submitting any evidence at the hearing to establish that the members of the proposed class are so numerous that joinder in the instant case is impracticable, relying on this court’s decision in Vela v. Plaquemines Parish Gov’t, 94-1161, 94-1162, 94-1163, 94-1164, p. 4 (La.App. 4 Cir. 6/29/95), 658 So.2d 46, 48, the plaintiffs posited that the numerosity requirement was presumptively met and that joinder is impracticable solely on the basis that the proposed class is comprised of 366 litigants.[16] Consequently, on appeal, the plaintiffs aver that because “a proposed class of 366 litigants facially establishes the numerosity requirement,” not only was it unnecessary for the trial judge to conduct a Galjour analysis, but also her doing so constituted legal error requiring this court to conduct a de novo review of the trial court judgment.[17] We disagree.
First, the jurisprudence is conflicting as to whether a presumption arises that join-der is impractical based solely on the number of proposed litigants. | ^Summarizing the conflicting jurisprudence surrounding *568 this issue, one legal commentator states the following:
[I]n Vela, the Louisiana Fourth Circuit Court of Appeal certified a class, stating “A presumption arises that joinder is impractical if more than 40 class members exist.” This statement was unnecessary, however, for “the class range[d] somewhere between 150 and 600 members, if not more.” Id. Moreover, the sole authority cited [Adams v. CSX Railroads, 615 So.2d 476 (La.App. 4 Cir.1993) ] involved thousands, with the court expressly noting that “whether the class is sufficiently numerous is not dependent upon a specified figure; this determination must be made upon review of the facts of each case.” Adams, 615 So.2d at 481. The First Circuit specifically declined to express an opinion on the Vela presumption. See Boudreaux [v. State, Dept. of Transp. & Development, 96-0137 (La.App. 1 Cir. 2/14/97), 690 So.2d 114, 123, n. 7]. The better course would be to implement no presumption, but to determine numerosity on a case-by-case basis.
Kent A. Lambert, Certification of Class Actions in Louisiana, 58 La. L.Rev. 1085, 1114, n. 63. The statement in Vela concerning the presumption was not determinative and constituted dicta. Vela does not control.
Second, despite the dicta language in Vela concerning the usage of a presumption in cases involving over 40 proposed class members, in a case the plaintiffs cite to further bolster their position — namely, Davis v. Jazz Casino Co., LLC, 03-0005, (La.App. 4 Cir. 1/14/04), 864 So.2d 880[18]— we specifically noted that “no set number of plaintiffs is required in order to fulfill [the numerosity] requirement,” and that while “the determination of numerosity in part is based upon the number of putative class members, [it is] also based upon considerations of judicial economy in avoiding a multiplicity of lawsuits, financial resources of class members, and the size of the individual claims.” Id., 03-0005 at 7, 864 So.2d | l7at 888. We further stated that “[d]etermination of whether this requirement has been fulfilled depends on the facts and circumstances of each individual case,” and that “[i]f joinder is a practical alternative, then the class should not be certified.” Id. at 7-8, 864 So.2d at 887-888. [Emphasis added.]
Based upon the above enumerated principles, this court identified several additional jurisprudential factors — what are now commonly referred to as the Galjour factors — to assist courts in making the case-by-case determination as to whether joinder is impracticable. These additional factors include: (1) the geographic dispersion of the class; (2) the ease with which class members may be identified; (3) the nature of the action; (4) the size of each plaintiffs claim; and (5) the judicial economy arising from avoiding multiple actions. See Galjour, 05-1360 at 10, 935 So.2d at 724-25. Despite the plaintiffs’ pronouncement, without citation, that these “additional jurisprudential factors are meant to be analyzed in a case involving small proposed classes only,” [emphasis supplied] and that they “are inapplicable in a proposed class involving hundreds of litigants, where impracticability of joinder is facially apparent,” we find the trial judge was correct in conducting the Galjour analysis in the instant case and, thus, de novo review is not warranted. Rather, the trial court is afforded great discretion in class certification determinations and, unless it has committed manifest error or an abuse of discretion, we must affirm its decision.
*569 After considering the testimony and reviewing the evidence, the trial judge in her written reasons for judgment determined that joinder would not be impracticable based on the following:
No evidence on the geographic dispersion of the class has been adduced. “Wide geographic dispersion of class members supports a finding of impracticability of | ^joinder and, therefore, a conclusion that the numerosity requirement is satisfied.” [Galjour, 935 So.2d at 725]. This Court takes notice that Tulane is a hospital that primarily serves the New Orleans [m]etropolitan community, but also recognizes that Tulane may have several of its patients travel from across the world to seek out the medical care that it provides. However, Plaintiffs have not produced evidence stating that a great portion of the class is from outside the metropolitan area. All three plaintiff representatives live in New Orleans, as it is likely that the majority of potential class members would be domiciled in or near this forum. As such, this factor weighs against certification.
The facts of this case show that the class member patients can be identified with ease. Tulane has the medical records on every patient who received an endoscopy from Units 49 and 50 during the October 7 through December 1, 2010 time periods, which allowed the mailing of approximately 366 letters. “Knowledge of names and existence of members has been called the ‘most important’ factor, precisely because it renders joinder practicable.” Galjour at 725, quoting, Primavera Familienstiftung v. Askin, 178 F.R.D. 405, 410 (S.D.N.Y.1998). “When the group is small and the individual members are identifiable, joinder rarely will be impracticable.” Id. This factor also weighs heavily against class certification. Although 366 possible plaintiffs exist, they are all readily ascertainable and can be joined, particularly when looking to the judicial economy component. See infra.
Concerning the nature of this action, this is a tort claim where the potential plaintiffs are claiming mental anguish that they suffered after being tested by one or both of Tulane’s endoscopic medivators. The Fourth Circuit in Gudo [v. Admins. of Tulane Educ. Fund, 06-1515 (La.App.4 Cir.9/5/07), 966 So.2d 1069] stated that:
In Hampton v. Illinois Central Railroad Company, 98-0430 at p. 8 (La.App. 1 Cir. 4/1/99), 730 So.2d []1091[,] at 1094-95, the First Circuit required that the plaintiffs seeking certification meet a threshold burden of “plausibility” as a component element of a prima facie showing of numerosity. In doing so, it emphasized that numerosity is not shown by mere allegations | l9of a large number of potential claimants, or, in the case of a mass tort, by showing a certain population within a certain geographic radius or proximity of the event. Id. In the case of a mass tort, this burden of plausibility requires some evidence of a causal link between the incident and the injuries or damages claimed by sufficiently numerous class members. This prima facie showing need not rise to the status of proof by a preponderance of the evidence, as would be necessary to prevail on the merits, (emphasis provided by this Court).
Gudo at 1076. Plaintiffs have made a prima facie showing for this factor. The letter sent by Tulane (which was induced by the omission in changing the temperature standards recommended by the manufacturer of the Rapicide disinfectant) may have caused approximately *570 366 patients and possibly their significant others to suffer some type of fear concerning the contraction of an infectious disease. The nature of the action concerning such causal link favors certification.
Concerning the size of each plaintiffs claim, “some sources have suggested that the size of the claims of class members or their financial ability to bring individual suits may be relevant to the issue of joinder impracticability.” Galj-our at 726. In this case, no evidence has been presented concerning this factor. While an individual such as A.C. may not have the financial wherewithal to pay for litigation herself, a plaintiffs financial ability concerning tort claims is usually cured by the fact that these actions can be feasibly undertaken on a contingency fee basis. The size of the claim for plaintiffs could be as low as no recovery to quantums in the thousands or beyond should there be some type of permanent, debilitating injury. This Court finds that there has been no proof adduced of the size of the claims being so overwhelming as to make joinder impractical. As such, this factor weighs against class certification.
Finally, judicial economy is dependent upon the following analysis:
The judicial economy factor recognizes that certification of actions as class actions isj^generally appropriate whenever the interested parties appear to be so numerous that separate suits would unduly burden the courts, and a class action would be more useful and judicially expedient than any other available procedures ... The jurisprudence addressing this factor can be divided into two categories ... First, “[m]any cases specifically finding the numerosity requirement to have been satisfied usually have done so not only on the ground that substantial numbers of people may have been affected by the defendant’s actions, but also on the basis that numerous people have filed or joined in various suits or have indicated a desire to assert a claim.” [ ... ] Conversely, in the other category of cases in which numerosity has been found lacking “often rest on the proposition that, despite large potential numbers of class members, an insufficient number have indicated a dissatisfaction with the defendant or a desire to assert a claim ...”
Galjour at 726. In this case, 71 persons have sought legal counsel in some form but only 20 have filed lawsuits. Of the 20 lawsuits, five have guaranteed opting out. Therefore, this Court is inclined to agree with the defendants that this number is not sufficient to indicate that the potential class members’ have a dissatisfaction with the way this matter has been handled.
After a thorough and rigorous review of the appellate record, including the exhibits and the deposition testimony of the proposed representatives and other plaintiffs, we cannot say and do not find that the trial judge abused her discretion or was manifestly erroneous in determining that the plaintiffs failed to carry their burden of establishing that the numerosity requirement has been met. The plaintiffs, erroneously relying on the existence of a presumption of numerosity, simply failed to present sufficient evidence to satisfy the requirement. While the record confirms that the 366 potential class members can be, and actually have been, identified and can be joined, other than the argument of counsel, the record is |2i otherwise devoid of any evidence regarding the potential geographic dispersion of the putative plaintiffs or the potential size of each of their pur *571 ported claims.[19] Additionally, the trial judge thoroughly examined whether certifying the class would further judicial economy, and we cannot say, based on her factual findings (i e., that of the 366 potential class members, “71 persons have sought legal counsel in some form but only 20 have filed lawsuits”), that she erred in determining that the evidence militated against class certification based upon the plaintiffs’ failure to fulfill the numerosity requirement. Accordingly, we find that the plaintiffs’ first assignment of error is without merit.

2. Predominance

In their second assignment of error, the plaintiffs aver that the trial court erred in denying class certification for failure to meet the predominance requirement set forth in La. C.C.P. art. 591 B(3). Article 591 B(3) requires that in order to certify a class action, a court must find “that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superi- or to other available methods for the fair and efficient adjudication of the controversy.” In Alexander v. Norfolk Southern Corp., 11-2793, p. 3 (La.3/9/12), 82 So.3d 1234, 1235-36 (quoting Dupree, 09-2602 at 12, 51 So.3d at 683), the Supreme Court explained that “[t]he predominance requirement is more demanding that the commonality | ^requirement, because it ‘entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class,’ a process that ultimately ‘prevents the class from degenerating into a series of individual trials.’ ” Moreover, in Price v. Martin, 11-0853 at 10, 79 So.3d at 969, the Supreme Court held that “in order for a case to proceed as a class action, there must be ‘significant proof ... of a common question — one where the ‘determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.’ ” (quoting Wal-Mart Stores, Inc. v. Dukes, — U.S.—, 131 S.Ct. 2541,180 L.Ed.2d 374 (2011)). “[Class] [c]ertification shall not be for the purpose of adjudicating claims or defenses dependent for their resolution on proof individual to a member of the class.” La. C.C.P. art. 591 C. See Dupree, 09-2602 at 43, 51 So.3d at 701.[20]
In the instant case, the trial judge acknowledged the existence of a common nucleus of operative facts; ie., the actions in failing to properly reprogram the temperature of the AERs resulted in a letter being circulated by Tulane to all of the potential plaintiffs in this matter. Further, the trial judge agreed that, “but for” the defendants’ actions, the plaintiffs would have no potential claim and no liability would exist on the part of either defendant. Even accepting that these elements *572 are common to all of the plaintiffs’ claims, the trial judge concluded that the plaintiffs’ proof fell short when it came to establishing that these common elements would predominate over questions affecting individual class members and, accordingly, | ^refused to certify the class. La. C.C.P. art. 591 B(3); Dupree, 09-2602 at 41, 51 So.3d at 699.
On appeal, the plaintiffs contend that because none of the proposed litigants have asserted claims for having actually contracted an infectious disease, the trial judge erroneously reasoned that the sexual histories and/or “other possible mediums of exposure” of the individual class members precluded predominance. The plaintiffs also argue that, in denying class certification, the trial judge failed to appreciate the difference between common causation and individual causation, leading her to err in her determination that the predominance requirement had not been satisfied. Our comprehensive review of the record evidence convinces us that the trial judge, after conducting an appropriate analysis and applying the applicable legal precepts to the evidence before her, did not commit manifest error in finding that the plaintiffs failed to carry their burden of establishing that the common factual and/or legal issues predominated over the individual factual issues and, thus, she did not abuse her vast discretion by refusing to certify the class.
The plaintiffs posit that in order to carry their burden of satisfying the predominance requirement, they need only establish that “common causation” may be proven on a class-wide basis, i.e., that the individual plaintiffs’ injuries were caused by the same event or course of conduct. Relying on Pnce, 11-0853 at 10, 79 So.3d at 969, the plaintiffs argue that the test for determining if predominance has been established is whether “each member of the class [can] prove individual causation based on the same set of operative facts and law that would be used by any other member to prove causation.” See Brooks, 08-2035 at 17, 13 So.3d at 559. Moreover, because the trial judge acknowledged the existence of a common nucleus of operative facts, the plaintiffs aver that the liability of the defendants — [issues^ of duty, breach, and common causation — will be resolved based upon common proof presented by all plaintiffs, thereby establishing predominance.[21] Contrariwise, the defendants ar *573 gue that the plaintiffs’ reliance on the specific language in Price to support their contention that they satisfied their burden of establishing predominance is misplaced because the Price court was actually addressing the commonality requirement and not the burden of proving predominance, which proof is more demanding. We agree.
In Price, property owners brought suit alleging an increased risk of disease, property damage, and diminished property values as a result of various pollutants emanating from operations occurring at a nearby wood-treatment facility. The district court certified the class despite expert testimony identifying numerous alternate sources of pollutants in the community which could also account for and/or contribute to the contamination of attic dust on the plaintiffs’ property. The appellate court affirmed. On writ of review, the Supreme Court examined whether the lower courts had conducted the requisite rigorous analysis when concluding that the action met the legal requirements for class certification. In reversing class ^certification, the Court recognized that, to ascertain whether the cause of the individual property owners’ alleged damages was due to the emissions from the wood-treatment facility or was the result of one of the other potential sources that were identified at the hearing, a plaintiff/property specific analysis would be required. Id., 08-2035 at 17, 79 So.3d at 973. The Price court noted that the lower courts, in certifying the class, had erroneously relied upon and/or misinterpreted language from its prior decisions “indicating that the requirement of common causation in a mass tort does not also require commonality in the amount or extent of damages [when it] attribute[d] the questions of whether and to what extent a property was impacted by [the pollutants] and whether [the pollutants] came from an emission by one of the defendants or another source to the issue of damages and not [to the issue of] causation.” Id., 08-2035 at 18, 79 So.3d at 973. The Court explained, however, that such questions are not one of damages, but rather, are questions of causation and liability. Id.
In this case sub judice, we find the plaintiffs, as did the plaintiffs in Price, erroneously confused the questions of whether and to what extent the plaintiffs were impacted by the Tulane letter advising of their potential exposure to infectious disease and whether the fear, anxiety, mental anguish, and emotional distress for which they seek to recover was caused by notification of their potential exposure or some other factor, as being questions relating to the issue of damages and not causation. To the contrary, we find — as did the trial judge — that these questions are directly related to the issue of causation and liability under La. C.C. arts. 2315, 2316, and 2317, not damages. Accordingly, in order to satisfy the | ^predominance requirement that common causation could be determined on a class-wide basis, the plaintiffs were required to present significant proof, using the same common evidence, that for each class member, the notification of potential exposure to infectious disease was the sole source or cause of the fear, anxiety, mental anguish, and emotional distress from which each individual plaintiff claims to suffer.
In refusing to certify the class, the trial judge determined the plaintiffs failed to present such proof. After considering the evidence admitted at the hearing, the trial judge concluded that, in order to deter *574 mine whether the notification of potential exposure to infectious disease caused the fear, anxiety, mental anguish, and emotional distress for which the plaintiffs seek to recover, an inquiry into each individual's medical, mental and sexual histories and other possible mediums for exposure to sexually transmitted diseases was going to be required. The plaintiffs argue that, because they are only seeking recovery for the fear of contracting an infectious disease and not for having actually contracted an infectious disease, under La. C.E. art. 401, these individualized evidentiary inquiries are totally irrelevant. Alternatively, the plaintiffs suggest that such evidence would only be relevant to the degree or measure of damages. For the reasons discussed supra, we disagree. Additionally, our review of the record confirms that the trial judge’s concern about the possibility of the proposed class action turning into a series of mini-trials is not unfounded. Specifically, the trial judge stated the following in her detailed written reasons:
While the questioning of an individual’s sexual history is usually more prejudicial than probative under La. C.E. Art. 403, in a case where a plaintiff states that they were |27to fear of contracting a sexually transmitted disease, their actions must fall in line with what a reasonable person would do in order to take the precautionary steps necessary to avoid the disease. As such, the prejudicial effect of asking the question does not outweigh the probative value of the defendants’ assertion of this affirmative defense. Therefore, this Court takes notice that such cross examination would be similar to that of A.C.’s deposition taken on June 26, 2012, where the following dialog took place:
Q: Here are some of these questions I have to ask you to do my job, so forgive me, if you will. Have you ever been tested for a sexually transmitted disease?
A: No.
Q: Never even been tested, to your knowledge?
A: Yes. I’m sorry. Yes. Two years ago.
Q: And tell me about that test. Why was it done?
A: I just done it, you know, just to have the test.
Q: Was this after you had been with Mr. Kelly or someone else?
A: No. I was with Mr. Kelly.
Q: And where did you have your test?
A: On Canal Street. I can’t recall what address, so — they was giving a free test.
Q: Okay. And how did it turn out?
A: Negative.
Q: Okay. Have you ever had a — been diagnosed with a sexually transmitted—
A: No.
Q: —disease? Is it true that you have had unprotected relations with Mr. Kelly?
A: Yes.
Q: Is there anyone else in your adult life that you’ve had unprotected relations with?
A: Yes.
Q: And how many partners?
A: Just one.
Q: And who was that?
A: [Mr.] Williams.
Q: And that’s the father of your son?
A: Yes.
[[Image here]]
Q: I’m looking at some medical records on you. There’s a reference in here that you had vaccination for *575 hepatitis in 2005. Do you remember anything about that?
A: I don’t recall.
Q: You don’t know why you would have been vaccinated for hepatitis in 2005?
A: No.
[[Image here]]
Q: Thank you. All right. I see here also, continuing to look at your medical records, that you went in to have yourself tested for HIV and sexually transmitted diseases in June of '07. Does that ring a bell with you?
A: No. I don’t recall.
Q: So you don’t recall what led you in June of '07 to be tested for HIV and sexually transmitted diseases?
A: No. Just if it — you know, just tested, you know.
Q: But nothing in particular comes to mind, anything you would be worried about?
A: No.
[[Image here]]
Q: There’s also a note in here in early 2010, which was a few months before you got sick,—
A: Uh-huh, yes.
Q: —where you discussed getting a hepatitis B vaccine with your doctor. Do you recall discussing getting vaccinated for hepatitis in 2010?
A: I don’t recall.
Q: And then in September of 2010, Ms. [C], I see an HIV test. Do you remember getting tested in September of 2010 for HIV?
A: Yes, yes.
Q: And what led to that testing?
A: The letter.
Q: Actually, I think we’re going to see that letter came about in January of '11. So this would have been about four months before that letter. Do you remember — this is pretty shortly before you got sick. Do you remember what led you to the doctor then for an HIV test?
A: I don’t recall.
I aflQ: Have you had any relatives or anyone in your home, to your knowledge, come down with hepatitis?
A: No.
Q: To your knowledge, has your husband been in contact with hepatitis?
A: No.
Q: Same questions for HIV. Have you had any relative or anyone in your home who’s been diagnosed with HIV?
A: No.
Q: How about your husband? Anybody on your husband’s side that you know of who’s been diagnosed with HIV?
A: No.
Q: And I may have asked this. Anybody in your husband’s family that you know of who’s been diagnosed with hepatitis?
A: No.
[[Image here]]
While this Court in no way wishes to cast any dispersions [sic] upon plaintiffs such as A.C., the defendants would be entitled in situations such as these to not only question the plaintiff, but also any other sexual partners a potential plaintiff may have had prior to any STD[22] testing or even post-testing.... A patient’s medical history will be highly relevant, and based upon the anticipated testimony such as that elicited in *576 this deposition, a multitude of individualized issues concerning causation may rear their ugly head, turning the proposed class action into a series of mini-trials. A plaintiff may have had fear of contracting an infection prior to the genetic testing because of a blood transfusion (like A.C. had concerning her stomach illness), an encounter with her partner, encounters with multiple partners, or even a pre-existing mental illness. The potential of this turning into a multitude of individual trials based upon this possible line of questioning could go back for several years dealing with very individualized issues.
[Emphasis supplied.]
We also think the testimony of the other plaintiffs contained in the appellate record is instructive and supportive of the trial judge’s conclusion that the |3nmultitude of individualized causation issues predominate in this ease precluding class certification. For example, B.C., a lymphoma patient since 2006, testified that she learned of her potential exposure via a phone call received from Tulane’s endoscopy department on 9 February 2011 requesting that she undergo blood work to test for infectious disease due to a sterilization issue related to the equipment used in her 2010 endoscopy.[23] In the following weeks, B.C. heard more than one story in the media concerning the incident involving Tulane’s endoscopes. On 9 March 2011, she presented to Tulane for blood work and then retained an attorney in response to the media advertisements. Even after her blood work indicated negative results for infectious disease on two occasions, and even though her primary care physician and oncologist advised her that no real cause for concern of actually contracting an infectious disease from the endoscopic procedure existed, this information did not allay her fears due to her pre-existing lymphoma. As of her June 2012 deposition, B.C. contends that because of her pre-existing cancer, she remains fearful of contracting an infectious disease resulting from her 2010 endoscopy. She admits that, in part, the ongoing anxiety she experiences is related to her having lymphoma, but states that the other part is related to her continued fear of contracting an infectious disease.
Further example: R.S., a doctoral student, testified that, in connection with his graduate studies, he spent time in several foreign countries, prior to which he was initially vaccinated for hepatitis B, that pre-dated his 2010 endoscopic procedure at Tulane. R.S. further testified that he has a history of seven sexual partners. He was tested only once for HIV prior to his endoscopy and that was in |S12008. Upon receipt of the letter from Tulane regarding his potential exposure to infectious disease and the recommendation for blood screening, R.S. testified that he was a little shocked and initially concerned, but didn’t put too much stock in it. He then saw a news clip about the incident involving the endoscopes at Tulane, which prompted him to contact an attorney. After retaining a lawyer, he presented for the recommended blood screening. He got more concerned as time passed. R.S. testified that, at the time of his deposition, he was in a sexual relationship with the same person he was sexually involved with at the time of his endoscopy. He explained that they engaged in unprotected sex prior to receiving the letter from Tulane, and only used protection one time in January 2011, but continued with unprotected sex each time thereafter. He was concerned for his girlfriend, but to date, she has not been test *577 ed. The following testimony by R.S. is also instructive as to why the issue of causation is not susceptible to class-wide resolution:
A. —I don’t know how everyone else reacted to [receiving the letter from Tulane], but I can only tell you how I reacted to this.
Q. Okay. Do you know if anyone else was actually scared when they received that letter?
A. I have no idea.
Q. You don’t know, if they were, what degree they were?
A. I have not spoken to anyone else who — that’s received the letter, so I can’t answer that question.
[[Image here]]
Q. Is it fair to say that you know nothing about the fears of any other class member?
A. I — I can only tell you how I reacted to that letter.
Q. Okay. You don’t even know if they were afraid at all?
A. Again, I can only tell you how I reacted to that letter.
Next, the testimony of H.B., a retired military serviceman who was suffering from longstanding depression and exhibited signs of post-traumatic stress disorder |sg(“PTSD”) and bipolar disorder prior to his 2010 endoscopy, highlights why the trial judge’s concern that an inquiry into an individual plaintiffs mental history would be necessary in order to properly establish that notification of the potential exposure to infectious disease was the proximate cause of a plaintiffs emotional distress versus other intervening or superseding factors. H.B. confirmed that he had previously been hospitalized for depression and suicidal ideation and had an extensive history of psychotropic drug use to control his mental illness issues prior to 2010. He testified that he has a sister for whom he is responsible that suffers from schizophrenia, which causes him extreme ongoing stress. He claimed that at the time he received the letter from Tulane, he was already being treated for PTSD and that news of his potential exposure “traumatized him to the point [that he] thought [he] was going to die.” Despite this pronouncement, H.B. also testified that he had almost forgotten about the letter from Tulane until his ex-wife sent him a newspaper article about the class action. Consequently, his anxiety was re-ignited by this litigation causing him to think about it often, even though he knows he is no longer in danger of contracting an infectious disease from the 2010 endoscopy.
In addition to the excerpts from A.C.’s testimony referred to above in the trial judge’s written reasons for judgment, the following colloquy took place during her deposition, which we find is relevant to the predominance inquiry:
Q. So did you get tested here four months ago?
A. Yes.
Q. And is that test still clear?
A. Yes.
Q. And did that make you feel better?
A. No.
Q. What could happen to make you feel better about it?
A. That I feel this way, that my life is — you know, is money damage.
Q. Money would make you feel better?
lajjA. Yes.
[[Image here]]
Q. Do you have an estimate of how much money would make you feel better?
A. No, I don’t.
*578 Q. Would anything other than money make you feel better?
A. No.
[[Image here]]
Q. And would anything other than money today make you feel less fearful?
A. No.
The plaintiffs aver that the trial court judgment should be reversed because the trial judge erroneously relied on Doctors Hosp. Surgery Ctr., L.P. v. Webb, 704 S.E.2d 185, 307 Ga.App. 44 (Ga.Ct.App.2010),[24] wherein the plaintiffs sought to certify a class of individuals claiming “compensation for any contracted diseases.” The plaintiffs argue that Webb is factually and legally inapposite to the instant case and, thus, the trial judge committed legal error in relying upon it to support her denial of class certification. The plaintiffs contend Webb is inapposite because the Webb court failed to make a distinction between common causation and individual causation, and because it failed to consider the cautionary instruction in Dupree where the Louisiana Supreme Court stated that “the mere fact that varying degrees of damages may result from the same factual transaction and same legal relationship, or that class members must individually prove their right to recover, does not preclude class certification.” Dupree, 09-2602 at 10, 51 So.3d at 682 (citing Bartlett v. Browning-Ferris Industries Chemical Services, Inc., 99-0494, p. 3 (La.11/12/99), 759 So.2d 755, 756). According to the plaintiffs, | Mboth of these differences have been “consistently reiterated by the Louisiana Supreme Court and relied upon by recent” appellate courts as being “critical to the predominance inquiry, and the district court, in failing to recognize them, applied incorrect legal standards.” We disagree.
The specific language in Webb that the trial judge relied upon to support her conclusion that the plaintiffs failed to meet them burden of establishing that common questions predominate over individual questions in the instant case[25] discussed *579 the “qualitative analysis necessary to show liability for injuries such asj^loss of consortium, anxiety, and emotional distress.” The Webb court noted that such analysis “demonstrates that common questions vital to proving causation must be answered on a highly individualized basis.” Webb, 704 S.E.2d at 188. In reversing the trial court’s decision to certify the class on the basis that the plaintiffs failed to satisfy the predominance requirement, the Webb court held “proving causation for claims based on injuries such as loss of consortium, anxiety, and emotional distress is inherently specific to the individuals affected.” Id. at 188-189. For all of the reasons previously discussed at length above, we disagree that this analysis conflicts with existing Louisiana law or that it demonstrates that the trial judge somehow misunderstood the difference between common causation and individual causation when she concluded that the plaintiffs had failed to satisfy the predominance requirement.
Though not formally assigned as error, the plaintiffs address the superiority requirement under La. C.C.P. 591 B. The plaintiffs erroneously claim the trial judge “did not reach the issue of superiority analysis.” However, in her reasons for judgment, the trial judge stated “[bjased upon the plaintiffs’ failure to prove the numerosity and predominance standards, the Superiority requirement automatically fails. This Court finds that the actions can proceed by joinder of the parties.” Clearly, the trial judge considered the superiori-te requirement and determined that the plaintiffs failed to show that the class action procedure is the superior method for adjudicating these claims and concluded that joinder is the better method.- We find the trial judge is in the best position to determine whether cases such as the ones presented by the instant litigation are better managed by using joinder and consolidation rather than the class action procedure. After careful consideration of all of the issues and elements presented by the instant claims, the trial judge |3ficoncluded that a joinder of the claims is the best way to manage this litigation. It was within the trial judge’s discretion to determine the superior method in this case and we see no abuse in her exercise of that discretion.
Based upon the totality of the record evidence, we agree with the trial judge that the plaintiffs have failed to show that common causation can be determined on a class-wide basis, but rather, under the facts presented by this case, an inquiry into each individual plaintiffs medical history, mental health history, and sexual history will be necessary in order to prove that the defendant’s alleged negligent acts were what caused each individual plaintiffs alleged fear and anxiety. Such a plaintiff-specific inquiry will inevitably degenerate into a series of mini-trials thereby defeating the purpose of the class certification procedure. After reviewing the testimony of the witnesses and the other evidence contained in the record, we do *580 not find that the trial judge failed to appreciate the difference between common causation and individual causation. To the contrary, we find she understood it clearly and, after considering the nature of the various claims already filed and acknowledging the possibility of additional claims being filed prior to the running of prescription, determined that joint consolidation of these cases for purposes of discovery, pre-trial motions and trial would accomplish the same judicial efficiency as a class action. Such a decision is a judgment call within the purview of the trial judge to be reversed by this court only upon a finding of manifest error. Finding none, we affirm the trial court judgment.
CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed.

AFFIRMED.

BELSOME, J., dissents with reasons.

. The use of the surname "Doe” by some of the plaintiffs in the caption of their pleadings is fictitious; as appropriate, we utilize the plaintiffs initials herein to identify them.

. The plaintiffs admittedly do not seek damages for actually having contracted infectious diseases, but rather, for the fear, anxiety, mental anguish, and emotional distress they allegedly endured upon learning about their potential exposure, in addition to the expenses incurred for disease screening.

. "High-level disinfection” is defined as "the complete elimination of all microorganisms in or on an instrument, except for small numbers of bacterial spores.” Healthcare Infection Control Practices Advisory Committee ("HIPAC”), Guidelines for Disinfection and Sterilization in Healthcare Facilities, 2008.

. The parties stipulated that of the 366 patients to whom Tulane sent certified letters, only 216 patients presented to Tulane for testing.

.The plaintiffs originally proposed a third subclass, which included all individuals who underwent endoscopic procedures at Tulane during the pertinent time period who had actually contracted infectious disease as a result of their exposure. At the class certification hearing, the plaintiffs conceded that this subclass failed to meet the numerosity requirement and, accordingly, it was withdrawn from consideration for class treatment.

. The plaintiffs originally identified four putative class representatives for the first subclass; namely, H.B., B.C., A.C., and R.S. Prior to the hearing, the plaintiffs removed H.B. as a class representative.

. At the time of the hearing, the plaintiffs had yet to identify any class representatives for the second proposed subclass.

.A judgment denying class certification is an appealable judgment. La. C.C.P. art. 592 A(3)(b). Article 592 A(3)(b) states that “[i]f the court finds that the action should not be maintained as a class action, the action may continue between the named parties. In either event, the court shall give in writing its findings of fact and reasons for judgment ... A suspensive or devolutive appeal ... may be taken as a matter of right from an order or judgment provided herein.” Louisiana is one of few states that permits an appeal of a judgment denying class certification. Federal law does not permit an appeal of the denial of class certification. This is because such a judgment is interlocutory in nature in that it does not deprive a claimant from continuing to litigate the cause of action. See William B. Rubenstein, 3 Newberg on Class Actions § 7.44 (5th ed.2013).

. Prior to the hearing, the parties stipulated that 366 patients received notification that they had been potentially exposed to infectious disease.

. As stated in Galjour, 05-1360, p. 7 (La.App. 4 Cir. 6/21/06), 935 So.2d 716, 722:
These two standards of review correspond with the two-step process for determining whether to certify a class action. First, a trial court must find a factual basis exists to certify an action as a class action. Second, the court must exercise its discretion in deciding if certification is appropriate.

. Our research indicates that in the Fourth Circuit, there has been only one case where we reversed a trial judge’s denial of class certification, which decision was thereafter reversed by the Supreme Court and the trial court's denial of certification reinstated. See Apolinar v. Professional Const. Services, Inc., 96-1492 (La.App. 4 Cir. 5/7/97), 694 So.2d 597, rev’d, 97-1490 (La.9/26/97), 701 So.2d 964. In all other instances, in this circuit, a trial court’s denial of class certification was affirmed. See Bergeron v. AVCO Financial Services of N.O., 468 So.2d 1250 (La.App. 4th Cir.1985); Royal Street Grocery, Inc. v. Entergy New Orleans, Inc., 99-3089, 99-3090 (La.App. 4 Cir. 1/10/01), 778 So.2d 679; Galjour v. Bank One Equity Investors-Bidco, Inc., supra; Thomas v. Mobil Oil Coip., 08-0541 (La.App. 4 Cir. 3/31/09), 14 So.3d 7; Pollard v. Alpha Technical, 08-1486 (La.App. 4 Cir. 1/28/10), 31 So.3d 576; Wallace v. Louisiana Citizens Property Ins. Corp., 10-0647 (La.App. 4 Cir. 12/6/10), 53 So.3d 514.
Two cases out of our brethren circuits have reversed a trial court’s denial of certification, both of which are distinguishable from the instant case.
In Guilloiy v. Union Pacific Coip., 01-0960 (La.App. 3 Cir. 5/15/02), 817 So.2d 1234, a case involving a toxic chemical spill at a railroad yard resulting in groundwater contamination to nearby residents, the Third Circuit reversed a trial court’s denial of certification when the record showed that the defendants failed to present evidence refuting the testimony of the plaintiffs’ expert in real estate valuation, who presented a method of calculating the property devaluation for each individual plaintiff based upon a mass appraisal, which would be the simplest and most cost-efficient method. Absent such evidence, the Third Circuit determined the trial court’s conclusions were without evidentiary support to its denial of certification. In the instant case, the testimony of the defendants' experts, Dr. Rutala and Dr. Roniger, amply supports the trial judge’s finding that the common issues in this case do not predominate over the individual questions.
In an unpublished opinion, Abshire v. State, Dept. of Insurance, 12-0104 (La.App. 1 Cir. 12/18/13), 2013 WL 6712235, approximately 826 to 1,346 plaintiffs filed suit against the Department of Insurance and multiple insurers in whose companies the plaintiffs had previously invested. The case originally proceeded as a consolidated matter with several hundred plaintiffs joined in the litigation represented by the same counsel. In order to direct the litigation, the plaintiffs formed a corporation to act as a representative body to legally act on behalf of all plaintiffs. The corporation’s board of directors, comprised of plaintiffs and elected by the plaintiffs, was given power of attorney to manage each individual claim. As the litigation progressed, numerous plaintiffs died or became incapacitated and their heirs or representatives were substituted as parties. At one point, settlement negotiations began and, based upon an Ethics Advisory Service Committee opinion, it became evident that the only way to obtain authority to settle the case was to convert it to a class action. At the conclusion of the class certification hearing, the judge denied certification on the basis that it could not ever be said that the joinder of the members was impracticable because all of the putative plaintiffs already were parties to the litigation. On appeal, the First Circuit ruled that the trial judge applied an erroneous legal standard because it equated "impracticable” with "impossible.” Utilizing de novo review, it reversed the trial court’s denial finding that, under the specific circumstances of the case, joinder was no longer practicable and the class action procedure was preferable.
We are not required to follow the decisions of other circuits and consider these two decisions to be orphan or fact specific. In the instant case, the record amply supports the trial judge’s conclusion that joinder in this matter is not impracticable and that she did not abuse her discretion in determining that joinder is the preferable manner of adjudicating the claims.

. McCastle was superseded and codified in part by the amendments to La. C.C.P. art. 591 et seq. (La.Act. 1997, No. 839).

. La. C.C.P. art. 591 A provides:
One or more members of a class may sue or be sued as representative parties on behalf of all, only if:
(1) The class is so numerous that joinder of all members is impracticable.
(2) There are questions of law or fact common to the class.
(3) The claims or defenses of the representative parties are typical of the claims or defenses of the class.
*566 (4) The representative parties will fairly and adequately protect the interests of the class.
(5) The class is or may be defined objectively in terms of ascertainable criteria, such that the court may determine the constituency of the class for purposes of the conclusiveness of any judgment that may be rendered in the case.

. La. C.C.P. art. 591 B provides:
An action may be maintained as a class action only if all of the prerequisites of Paragraph A of this Articles are satisfied, and in addition:
(1) The prosecution of separate actions by or against individual members of the class would create a risk of:
(a) Inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
(b) Adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
(2) The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
ís) The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to these findings include:
(a) The interest of the members of the class in individually controlling the prosecution or defense in separate actions;
(b) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
(c) The desirability or undesirability of concentrating the litigation in a particular forum;
(d) The difficulties likely to be encountered in the management of a class action;
(e) The practical ability of individual class members to pursue their claims without class certification;
(f) The extent to which the relief plausibly demanded on behalf of or against the class, including the vindication of such public policies or legal rights as may be implicated, justifies the costs and burdens of class litigation; or
(4) The parties to a settlement request certification under Subparagraph B(3) for purposes of settlement, even though the requirements of Subparagraph B(3) might not otherwise be met.

. At the class certification hearing, the parties entered into a joint stipulation that the adequacy requirement had been satisfied in this matter.

. Citing Vela, the plaintiffs argue that a presumption arises that joinder is impractical if a proposed class consists of more than 40 litigants. We note at this point that the names of the 366 potential plaintiffs (the patients) are known; accordingly, the actual names of their sexual (significant others) partners (the "B” class) is precisely knowable and ascertainable.

. Where a legal error of a trial court interdicts the fact-finding process, the manifest error standard is no longer applicable. In re Succession of Sporl, 04-1373, p. 5 (La.App. 4 Cir. 4/6/05), 900 So.2d 1054, 1058. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Id. Legal errors are prejudicial when they materially affect the outcome or deprive a party of substantial rights. Id. When a legal error of the trial court materially affects the outcome or deprives a party of substantial rights, the appellate court conducts a de novo review. Id. De novo review should be limited to consequential legal errors. Id. In the case at bar, the denial of the class certification does not deprive any plaintiff of his or her right to litigate his or her claim.

. Davis involved a proposed class of 148 members.

. In their brief on appeal, the plaintiffs seek to emphasize the “importance ... that none of the litigants are claiming to have contracted infectious disease” and, thus, aver that since they "are not claiming [any] type of 'debilitating, physical injury’" as suggested by the trial judge in her written reasons for judgment, this factor should have been resolved in their favor and not the defendants. However, the record does not contain any stipulation regarding the potential size — large or small — of any of the plaintiffs’ claims. Moreover, according to the deposition testimony of those plaintiffs contained in the record, some of the plaintiffs claim to still suffer from ongoing psychological injuries that disrupt their lives as a result of this incident some three-and-one half years later.

. In Dupree, the Supreme Court reversed certification based upon a finding that "individual liability issues and defenses thereto predominate over any common issues.” Dupree, 09-2602 at 41, 51 So.3d at 701.

. In the case at bar, the plaintiffs have advanced two legal theories of recovery against the defendants: (1) negligent infliction of emotional distress resulting from notification of their potential exposure to infectious disease pursuant to La. C.C. arts. 2315 and 2316; and (2) garde, pursuant to La. C.C. art. 2317. Recovery for negligent infliction of emotional distress has been limited to those cases involving the "especial likelihood of genuine and serious mental distress, arising from special circumstances, which serves as a guarantee that the claim is not spurious.” Moresi v. Department of Wildlife and Fisheries, 567 So.2d 1081, 1096 (La.1990). Thus, in order to prove a claim for negligent infliction of emotional distress, the plaintiffs must establish the following: (1) the defendants owed a duty to the plaintiffs; (2) defendants breached that duty; (3) the defendants' breach of the duty was a cause-in-fact of the plaintiffs’ alleged harm; (4) the defendants’ breach was a legal cause of the harm plaintiffs’ claim to have suffered; and (5) actual damages. Crockett v. Cardona, 97-2346, p. 3 (La.App. 4 Cir. 5/20/98), 713 So.2d 802, 804. In Bacas v. Falgoust, 99-1312, p. 1 (La.App. 5 Cir. 5/3/00), 760 So.2d 1279, 1282, the plaintiff was also required to establish "that the mental anguish suffered ... was genuine and serious.” Additionally, in order for the plaintiffs to establish their right to recover for garde under article 2317, they must prove: (1) the AERs were under the care, custody, or control of the defendants; (2) the AERs had a vice or defect which presented an unreasonable risk of harm to the plaintiffs; and, (3) the defect was a cause-in-fact of the harm plaintiffs claim to have suffered. Graubarth v. *573 French Market Corp., 07-0416, p. 4 (La.App. 4 Cir. 10/24/07), 970 So.2d 660, 663-664.

. A STD refers to a sexually transmitted disease.

. B.C.’s medical records indicate that she had previously been tested for hepatitis C and HIV in 2005 with negative results, which testing she attributes to low blood platelet counts.

. In Webb, involving a class action certification procedure that substantially mirrors La. C.C.P. art. 591, the defendants failed to meet the manufacturer's instructions for cleaning endoscopes for over a nine-year period. Consequently, they mailed over 1300 letters to patients who were potentially exposed to unsterilized endoscopes advising of a slight chance of potential infection and offering free initial and follow-up screening to patients and their spouses or significant others.

. In her written reasons for judgment, the trial judge relied upon the following language in Webb to support her determination that the plaintiffs herein failed to satisfy the predominance requirement:
In the present context, the particularity of the negligence claim is important because if "the issue of liability vel non turns upon highly individualized facts, the [plaintiff] cannot meet the predominance requirement ...” The qualitative analysis necessary to show liability for injuries such as loss of consortium, anxiety, and emotional distress demonstrates that common questions vital to proving causation must be answered on a highly individualized basis ...
In the present context, proving causation for claims based on injuries such as anxiety, loss of consortium and emotional distress is inherently specific to the individuals affected.” For example, Charlie Webb deposed that he suffers from post-traumatic stress disorder that pre-existed his treatment by the Hospital, and he agreed that it would be difficult, if not impossible, to determine to what extent his anxiety is attributable to the treatment as opposed to his pre-existing condition. Further, to demonstrate liability for loss of consortium (even for an amount of damages to be determined later), a plaintiff must show that the Hospital’s negligence was the proximate cause of a loss of the reciprocal rights and duties of the marriage covenants, such as *579 "society, companionship, love, affection, aid, services, cooperation, sexual relations, and comfort.” Proving causation of the loss of such rights and duties would necessarily require a case-by-case inquiry into the characteristics of each married class member’s marriage and lifestyle. Accordingly, the Webbs’ burden of proof, even for liability alone, is inextricably linked to a case-by-case evaluation of causation for each class member’s injuries. Therefore, "[bjecause many individual suits would be necessary in this case even if the one or two common issues were resolved class-wide, we are constrained to conclude that the trial court abused its discretion in granting [the Webbs’] motion for class certification.”
Webb at 188-89.