Judge Dennis R. Bagneris, Ad Hoc
This class certification issue was previously before this Court on defendants' appeal of the certification of a class related to an alleged toxic waste release at 2400 Canal Street, a building that operated as an Annex to New Orleans City Hall from 1982 until 1999. In the previous appeal, we vacated the trial court's judgment certifying the proposed class and remanded because there was no precise definition of the class. See Anderson, et al v. City of New Orleans , 16-1013 (La. App. 4 Cir. 6/14/17), 222 So.3d 800. On remand, the trial court issued Amended Reasons for Judgment, again indicating that plaintiffs had met the requirements of La. Code Civ. P. art. 591, certifying the class, and defining the class according to plaintiffs' proposal, as follows:
All persons who had an employment relationship with (meaning reported to work at) the building located at 2400 Canal Street ("The Annex") from 1982 to December 9, 1999 and who were exposed to toxic chemicals stored in the basement of the building at any time from August 1982 until December 9, 1999 and who suffered injury as a result of that exposure.
Defendants-appellants-the City of *433 New Orleans ("the City"), NID Corp.,[2] and Pan-American Life Insurance Company ("Pan-Am")-separately appealed the trial court's certification of the class and the class definition. We consolidated the defendants' appeals for our consideration. After careful review of the record and consideration of the trial court's amended judgment, amended reasons for judgment, and the applicable law, we reverse the trial court judgment certifying the class and remand for further proceedings.
FACTS AND PROCEDURAL HISTORY
The City began occupying the building at 2400 Canal Street in 1982 as a lessee but purchased the building in 1985 from Poydras Square, a predecessor to defendant-appellant NID Corporation. Before Poydras Square acquired it in 1982, the building was owned and occupied by Pan-Am. According to plaintiffs' recitation of the facts, Pan-Am used to print its own brochures, and the chemicals used in the printing processes were stored in the basement in barrels or drums. Plaintiffs allege that barrels of chemicals remained in the basement through changes in ownership from Pan-Am to Poydras Square in 1982 and from Poydras Square to the City in 1985. Plaintiffs further allege that when the City acquired the building, the barrels were not removed.[3]
On December 9, 1999, approximately 17 years after the City assumed occupancy of the Annex, there was a chemical leak and "smoke" emanated from the east room in the basement where the barrels were stored. The New Orleans Fire Department responded to a call and, upon discovering that the smoke was caused by chemical vapors, dispatched its own HAZMAT team and also called United States Environmental Services ("USES"), a hazardous materials removal team.
According to a report authored by District Fire Chief Dave Tibbetts, the Fire Department called for an evacuation of the building "because of the potential complete release of the chemicals while the drums were being over packed." USES secured and removed 19 barrels containing aqueous solutions of various acids and bases. The December 9, 1999 report prepared by USES explains that the "initial assessment" was that three drums of corrosive material containing a combination of sodium 2-mercaptobenzothiazole and potassium hydroxide were leaking.[4] A HAZMAT crew over packed these three leaking metal drums by placing them in even larger drums for removal. A second crew then entered the area to neutralize any spilled material and to remove other contaminated *434 material from the room, such as parking meters, immobilization devices (boots), and other equipment. According to the report, USES also removed an additional 16 (plastic) drums, "all of which contained (1-Hydrofluoric acid, 3-Hydrochloric acid, 12-Mineral acid)." The USES report states: "there was liquid on the floor surrounding the drums, and a pH test indicated the liquid was acid." The next day, USES continued to remove contaminated material. According to the USES report, "it was impossible to identify which drums of acid were leaking." Thus, all 16 (plastic) drums were over packed in much larger drums. The over-packed drums were sent to Pollution Control Industries (PCI) for disposal. According to the PCI Material Data Surveys, there were 12 drums of "mineral acid," three drums that contained concentrated hydrochloric acid and water, one drum of Aluma Brite, which contains 10-15% of hydrofluoric acid, and two [or three, according to the USES report] drums of Cecotrol, with the active ingredients in Cecotrol being sodium 2-mercaptobenzothiazole and potassium hydroxide, a basic rather than acidic solution. There was also a drum of aluminum phosphate, a non-hazardous material. The PCI data, like the USES data, do not reveal which, if any, of the drums containing acidic compounds were leaking, nor indicate how much of the contents of any of the drums may have leaked.
In a letter to the New Orleans Fire Department dated December 13, 1999, USES further recommended that the electrical wiring in the room be rewired by an electrician, because it may have been affected by acid fumes. USES also revealed the results of its "wipe tests."[5] A wipe sample performed on one of the air vents in the east room revealed a pH of 2.88, with additional wipe samples taken in the east room revealing pH values between 3.44 and 5.18.[6] USES therefore stated: "Since it is impossible to accurately determine the extent of acid contamination, U.S.E.S. recommends that an HVAC engineer assess the entire vent system for removal." Wipe tests performed in the west room of the basement and ducts in the west room revealed pH values of 6.21, 7.48, 4.77, and 6.45, closer to neutral. No wipe tests were performed on any other floors or any other areas of the building. The City ultimately relocated all of the offices that had been housed in the Annex at 2400 Canal Street to other City buildings.
On May 12, 2000, five plaintiffs, Thomas Anderson, Pamela Davenport, Evelle Thomas, June Harvey, and Joseph Wong, filed a putative class action against the City of New Orleans on behalf of all persons who sustained harm because they were "exposed to chemicals at 2400 Canal Street," the City Hall Annex. Plaintiffs alleged that the City was aware that "hazardous, dangerous chemicals were present" but alleged the City "nonetheless ordered petitioners and those similarly situated to work in this dangerous environment." Plaintiffs alleged that the City "negligently and intentionally caused and/or allowed" these chemicals to remain at the Annex.
Plaintiffs amended their petition on April 6, 2001, to add Pan-Am as a defendant. Plaintiffs alleged that Pan-Am *435 placed the chemicals in the building and that the storage of the chemicals created an unreasonably dangerous condition within the Annex. Plaintiffs again amended their petition to clarify that Pan-Am was the former owner of the Annex, and plaintiffs alleged that chemicals stored in containers not appropriate for long-term use were used to clean Pan-Am's printing presses. The amended petition contends that the "leakage, spillage and/or diffusion of chemical vapors" contaminated the building. Plaintiffs further allege that the building's contamination persisted until the chemicals were removed in December 1999.
In a third amended petition filed on June 22, 2005, plaintiffs added Poydras Square, Inc. and New Orleans Centre Associates, a Louisiana partnership in commendam , as additional defendants, arguing that Poydras Square owned the property after Pan-Am.[7] Plaintiffs argue that even though Poydras Square did not buy the chemicals, it allowed the chemicals to remain on the property and it failed to warn of the alleged danger associated with the chemicals.
As a result of the alleged chemical exposure, plaintiffs claim to have suffered from or continue to experience a variety of medical problems including runny nose, coughing, sinus problems, headaches, and eye problems. When plaintiffs filed a motion to set hearing on class certification in 2014, their motion indicated that the case had been pending for some time [14 years] because their toxicological experts indicated that the injuries to the class could not be fully determined without the passage of time.
In September and October 2015, after extensive discovery, the trial court presided over a four-day hearing that included live testimony of plaintiffs, Thomas Anderson and June Harvey-Armour, as well as testimony from a number of expert and fact witnesses. Plaintiffs introduced additional fact witness testimony via deposition, plus the Claimant Questionnaires of Thomas Anderson and Evelle Thomas and the Client Form for June Harvey-Armour, three of the named plaintiffs in the lawsuit.
Thomas Anderson worked for the City from the mid-1980s through 2000. He remembers seeing barrels when he first occupied a section of the basement in the 1980s. He reported smelling a "rotten egg" smell throughout the building. Mr. Anderson testified that he never saw any of the drums leaking. June Armour, another named plaintiff, began working as a parking control officer in late October 1999. She spent approximately one hour per day in the Annex basement for the almost six weeks that she worked in the Annex before it was evacuated on December 9, 1999. She never saw the drums in the east room, but she said there was a funny, unpleasant smell. Ms. Harvey-Armour complained of itchy eyes, runny nose, asthma, sinusitis, and migraines. Her Client Form, introduced into evidence, indicates that she was diagnosed with serious allergies and chronic sinusitis before she ever began working at the Annex in 1999. In addition, she admitted that she did not see a doctor about any of her symptoms until many years after she left the Annex at the end of 1999.
Patricia Williams, Ph.D., plaintiffs' expert in toxicology, epidemiology, and environmental exposure, among other disciplines, testified regarding the adverse effects of hydrochloric and hydrofluoric *436 acids-effects that include severe burns, skin redness or irritation, sinus problems, asthma, and coughing. Dr. Williams also testified that these compounds can cause cataracts and glaucoma.[8] Dr. Williams agreed that the symptoms plaintiffs have alleged are consistent with exposure to hydrochloric or hydrochloric acid, but she also agreed that these symptoms are non-specific, meaning that they can be caused by any number of irritants and do not necessarily indicate acid exposure.
Plaintiffs' expert in environmental science and chemistry, Paul Templet, Ph.D., testified regarding the chemicals involved and how people in the Annex may have been exposed. Based on the USES "wipe tests" taken in the east room, the west room, and the duct work in the east room after the December 9, 1999 incident, which returned pH levels in the low acidic range, as well as the level of corrosion that USES found in the east room, Dr. Templet believed that there was an acid leak over an extended period of time and that the leak did not occur in just one day. He believed that the inhalation exposure to acid gases was "very likely and probable." He stated that the basis for his opinion was the history of the complaints, and that the acid leak could have started with a pin-hole size leak to one of the drums containing acid.
On cross examination, Dr. Templet agreed that there was "no evidence prior to 1999" of the size of any acid leak. He agreed that three metal drums (containing a base) were leaking, and that the USES report indicated that it was impossible to tell if any of the other drums (containing acids) were leaking. Dr. Templet explained that if the three metal drums containing Cecotrol had been leaking, the USES wipe tests and the USES report would have indicated hydroxides (bases) on the floor of the east room instead of the acidic pH ranges that the wipe tests from the east room confirmed. Dr. Templet agreed that the "rotten egg" smell detected by some witnesses indicated a sulphur or sulphur compound, and that sodium 2-mercaptobenzothiazole, which is found in Cecotrol, would emit that odor; on the other hand, that hydrochloric acid and hydrofluoric acid would have an acrid, biting smell. Dr. Templet further agreed that the wipe tests performed by USES could not be correlated with any particular dose or exposure of the toxic compounds to anyone in the vicinity.
Defendants' expert in toxicology and industrial hygiene, James Rasmuson, testified that the best evidence of the types of chemicals in the barrels is to look at the three identified brand names found on some of the barrels-Cecotrol, Deox, and Aluma-Brite-plus the report from Pollution Control Industries (PCI), the company that was tasked with disposing of the barrels. The PCI report confirmed that the active ingredients in Cecotrol are sodium 2-mercaptobenzothiazole and potassium hydroxide. The City of New Orleans Emergency Incident Site Safety Plan, as well as the USES report, also state that the metal barrels that had corroded contained sodium 2-mercaptobenzotiazole and potassium hydroxide, the components of Cecotrol.[9] Mr. Rasmuson testified that Cecotrol smells strongly of rotten eggs or burned rubber but it does not have any vapor pressure and does not pose an inhalation threat if it remains in solution and is *437 not sprayed. The testimony of plaintiffs' experts, Dr. Williams and Dr. Templet, did not contradict Mr. Rasmuson's testimony in this regard.
Record evidence shows that a Deox label was found on at least one of the barrels in the east room. Deox contains a 5-10% concentration of hydrochloric acid and citric acid. Mr. Rasmuson stated that the acids in Deox are not very concentrated and are not very volatile. The evidence showed that at least three drums were Deox (or a similar solution) that contained hydrochloric acid. Aluma-Brite, the third brand name identified, contains 7-13% of hydrofluoric acid. At least one drum of Aluma-Brite/hydrofluoric acid solution was found in the east room. Also, one drum of aluminum phosphate was identified, which Dr. Templet indicated is a solid and is not characterized as a hazardous waste. According to PCI's Material Data Survey found in the record, there were 12 additional barrels of unspecified "mineral acid" found. Mr. Rasmuson testified that "mineral acids" could mean hydrochloric acid, sulfuric acid, or more dilute acids, but the contents of these barrels were never identified.[10] Mr. Rasmuson further explained that acids are sold in plastic drums, not metal drums, because plastic materials are not easily attacked by acids.
In contrast to Dr. Templet's testimony, Mr. Rasmuson opined that there could not have been an acid leak for a long period of time because the odor of acid is so irritating that no one would have been able to be around it for very long. In other words, the "odor threshold" was very low, and if acids were present in dangerous quantities, someone within the vicinity would have smelled it.
Dr. Rasmuson testified that people who worked in the east room or close to the east room in the basement could have been exposed to hydrochloric acid above the acceptable occupational exposure limits, but employees who worked in other parts of the building would not have been exposed above those limits. He also stated that glaucoma and cataracts could not be caused by only low-level exposure to hydrochloric or hydrofluoric acid. Finally, Dr. Rasmuson testified that exposure to acid is not cumulative, meaning that any potential long-term exposure in very low doses would not result in subsequent damage.
Plaintiffs also presented expert testimony of Mr. Joseph Handlin, a mechanical engineer with experience in designing heating, ventilation, and air conditioning ("HVAC") systems and plumbing systems. Mr. Handlin explained his evaluation of the HVAC system and, based on a number of assumptions that he used in evaluating the system, he believed that air contaminated with acid particles from the basement could have circulated throughout the rest of the building.
In the Amended Reasons for Judgment, the trial court described Mr. Handlin's testimony as follows:
Mr. Handlin testified that hazardous chemicals in the air could move from the east room in the basement and be circulated through the remainder of the building. The AC unit was served by a GE or fan room and another fan room called GW. GA was connected to GE and the contaminated air flowed from GE into GA and followed a duct path back to GE. Then GE would be reconditioned in the fan room and distributed to the upper *438 floor via a duct chase. There was also a HVAC system feeding the building from the penthouse floor as well which was all interconnected. Air would have moved from the air in the east print room where the chemicals were stored and circulated throughout the building through the HVAC, the elevators or the corridors and stairwells. Mr. Handlin indicated that if chemicals were leaking over a long period of time that would result in a greater amount of chemicals being circulated throughout the building.
Mr. Handlin concluded that any of the three interconnected handling units, AHU-GA, AHU-E or AHU-W would circulate contaminated air throughout the ground floor area served by this system and the small area on the first floor. He opined the supply isolation dampers were open, permitting contaminated air flow throughout the ground floor area served by this system. Mr. Handlin opined that based on the corroded fan scroll of AHU-E located in the east room, the unit operated while corrosive air was present. Ultimately, Mr. Handlin concluded the chemicals at issue would have circulated throughout the HVAC system.
In short, Mr. Handlin testified that if chemicals had leaked over a long period of time, the return duct would be a pathway for these particles to be distributed throughout the rest of the building. In evaluating the system, Mr. Handlin assumed that AHU-E was working during the time of the chemical leaks. Mr. Handlin also assumed that the dampers for the general HVAC system that serves other parts of the Annex, AHU-GA, were closed, which would restrict the introduction of fresh air into the building. Mr. Handlin acknowledged that the USES picture taken on December 9 or 10, 1999, showed that AHU-E did not have a door on it and further agreed that during his inspection in 2008, the dampers for the general HVAC system were open rather than closed. He also agreed that upon moving farther away from "ground zero" (farther from the east room), the air would become more dilute due to the introduction of air from the above floors and air from outside of the building. Finally, Mr. Handlin stated that he did not find any abnormal corrosion in the fan room of AHU-GA.
Defense expert Ervin Ritter, a mechanical engineer who designs HVAC systems, relied upon the report prepared by plaintiffs' expert, Mr. Handlin, when evaluating the HVAC system in the Annex. The trial court's iteration of Mr. Ritter's testimony states:
[Mr. Ritter] concluded that the HVAC system would have maintained a positive pressure in the upper five floors which would have limited the exposure of the acid gases to the ground floor. Mr. Ritter explained that the Annex had a chilled water air conditioning system, which used two water wells for the condenser side. The chilled water is then circulated through cooling coils in the building. The system is a hybrid coil system with spray coils, meaning air has direct contact with the chilled water and then flows through the chilled water coil. He indicated that water spray provides the benefit of removing dust and airborne particles, and also absorbing gas in the air path through the cooling system. He pointed out that there were two fan rooms on the ground level and two fan rooms in the penthouse, with ducts that feed from the ground level upward and ducts feeding from the fan rooms downward, all of which are connected together. He concluded that air from the east room where the barrels were found could not have circulated throughout the building.
*439 Additionally, Mr. Ritter testified that because AHU-GA had low levels of corrosion, unlike AHU-E, which had a high level of corrosion, he believed that the AHU-GA system was operating before and on December 9, 1999, and serving the east room and west room at that time. Mr. Ritter determined that AHU-E could not have been operating on December 9, 1999, because the controls had been "ripped out of it," as depicted in the USES pictures, and that it had not been operating for some time, based on the amount of rust on it. Even if AHU-E had been operating at that time, however, Mr. Ritter testified that it would have circulated air in the area of the east room and possibly to the west room. On cross examination, Mr. Ritter agreed that some air from the east and west rooms on the ground floor could have escaped to the first floor.
Mr. Ritter further explained that any HVAC system must bring in outside air to "flush out the contaminants of the human body" such as carbon dioxide and water vapor. Mr. Ritter calculated that the entire air volume of the building would be exchanged once per hour. He found no evidence to indicate that the dampers on the roof would fail to a closed position, as Mr. Handlin assumed, because it was just as likely that they could have failed to an open position. Similarly, Mr. Ritter testified that Mr. Handlin could have assumed that the dampers in the east and west room were closed, but he assumed that they were open. Mr. Handlin also assumed that AHU-GA was not operating; Mr. Ritter believed that it was operating.
DISCUSSION
Class Certification Requirements
When evaluating whether a class should be certified, the trial court is required to conduct a " 'rigorous analysis,' which includes evaluating, quantifying, and weighing 'the relevant factors, to determine to what extent the class action would, in each instance, promote or detract from the goals of effectuating substantive law, judicial efficiency, and individual fairness.' " Doe v. University Healthcare Systems, L.L.C. , 13-1457, p. 11 (La. App. 4 Cir. 7/9/14), 145 So.3d 557, 565. The trial court must "actively inquire into every aspect of the case and should not hesitate to require showings beyond the pleadings" to get a better understanding of the claims, defenses, relevant facts, and applicable law, so that the court may make a meaningful determination of the certification issue. Id. ,(quoting Brooks v. Union Pac. RR Co. , 08-2035, p. 10 (La. 5/22/09), 13 So.3d 546, 554 ). Any error made in deciding class certification should be made in favor of rather than against maintaining class certification. Doe , 13-1457, p. 12, 145 So.3d at 565.
The certification of a class is governed by La. Code Civ. P. art. 591, which closely tracks the Federal Rules of Civil Procedure's Rule 23. Under La. Code Civ. P. art. 591 (A), one or more members of a class may sue as representative parties on behalf of all similarly situated parties only if:
(1) The class is so numerous that joinder of all members is impracticable.
(2) There are questions of law or fact common to the class.
(3) The claims or defenses of the representative parties are typical of the claims or defenses of the class.
(4) The representative parties will fairly and adequately protect the interests of the class.
(5) The class is or may be defined objectively in terms of ascertainable criteria, such that the court may determine the constituency of the class for purposes of the conclusiveness *440 of any judgment that may be rendered in the case. This prerequisite shall not be satisfied if it is necessary for the court to inquire into the merits of each potential class member's cause of action to determine whether an individual falls within the defined class.
La. Code Civ. P. art. 591(A). More familiarly, these are the requirements of numerosity, commonality, typicality, adequacy of the named representative(s), and an objectively definable class. In addition to being required to meet all elements of Article 591(A), a class action may be maintained only if one of the three alternative requirements enumerated in 591(B) is satisfied. Price v. Martin , 11-0853 (La. 12/6/11), 79 So.3d 960, 968. Plaintiffs sought certification in this case under La. Code Civ. P. art. 591(B)(3), which mandates that a court shall find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to all other available methods for the fair and efficient adjudication of the controversy." The "predominance" requirement is more demanding than the commonality requirement found in Article 591(A) because it entails "identifying the substantive issue that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class[.]" Alexander v. Norfolk So. Corp. , 11-2793, p. 2 (La. 3/9/12), 82 So.3d 1234, 1236 (quoting Dupree v. Lafayette Ins. Co. , 09-2602 (La. 11/30/10), 51 So.3d 673 ). Finally, Article 591(C) provides: "Certification shall not be for the purpose of adjudicating claims or defenses dependent for their resolution on proof individual to a member of the class. However, following certification, the court shall retain jurisdiction over claims or defenses dependent for their resolution on proof individual to members of the class."
At a class certification hearing, the only issue for the court to consider is "whether the case is one in which the class action procedural device is appropriate. Thus, 'the court is not concerned with whether the plaintiffs have stated a cause of action or the likelihood that they ultimately will prevail on the merits.' " Watters v. Dep't of Soc. Servs. , 05-0324, p. 7 (La. App. 4 Cir. 4/19/06), 929 So.2d 267, 273-74.
Arguments on Appeal
The defendants-the City of New Orleans, NID Corp., and Pan-Am-all argue that this case is inappropriate for class certification and that joinder would be the better way to handle these claims.
The City of New Orleans and Pan-Am argue that the class cannot be objectively defined in terms of ascertainable criteria under Article 591(A)(5), and that plaintiffs cannot prove the commonality requirement of Article 591(A)(2) and the predominance and superiority requirements of Article 591(B)(3). NID argues that certification of the class is inappropriate due to a lack of common causation evidence. According to NID, a class member cannot rely on another class member's evidence of exposure to prove his own claim. Additionally, NID contends that because causation is not the same for each plaintiff, individual trials would be required, thereby defeating the purpose of a class action.
The defendants also point out that there are different legal standards for different defendants and different putative class members that apply across the different periods of alleged exposure. For instance, defendants argue that a 1982 claimant who is a City employee arguably would have a tort claim against his employer and strict liability claims against other defendants.
*441 In contrast, a 1999 claimant would have no strict liability claim because the law has changed since 1982, and no tort claim, because his recourse against his employer would be under the worker's compensation rules. Finally, NID argues that even if class certification were permissible, the class as defined is not workable, because the definition depends upon a presumption of liability.
Plaintiffs-appellees argue that the injuries complained of are consistent with acid exposure, and that the sources of the acids are the barrels in the basement of the Annex. Plaintiffs contend that they have met all the requirements under Article 591-numerosity, commonality, typicality, adequacy of representation, an objectively definable class, predominance, and superiority-and that the district court properly certified the class. Plaintiffs contend that the defendants' arguments on appeal go to the merits of the claims rather than addressing the issues related to certification.
Standard of Review and Burden of Proof
"The customary standard of review for a trial court's ruling on a motion for class certification is tri-parte. Factual findings are subject to the manifest error standard, but the trial court's ultimate decision of whether or not to certify the class is reviewed by the abuse of discretion standard. The question of whether the district court applied the correct legal standards in determining whether to certify the class is reviewed de novo ." Husband v. Tenet HealthSystems Mem'l Med. Ctr., Inc. , 08-1527, pp. 5-6 (La. App. 4 Cir. 8/12/09), 16 So.3d 1220, 1227 (internal citations omitted). See also Price , 11-0853, pp. 7-8, 79 So.3d at 967 (same). "Louisiana courts are afforded vast discretion in determining whether to certify a class and the trial judge 'must be afforded wide latitude when making factual and policy determinations as to the appropriateness of a class.' " Doe , 13-1457, p. 9, 145 So.3d at 563-64 (quoting Thomas v. Mobil Oil Corp. , 08-0541, p. 13 (La. App. 4 Cir. 3/31/09), 14 So.3d 7, 14 ). "However, 'that general rule cannot and should not be used as a substitute for the rigorous analysis required to determine whether the prerequisites of Louisiana's class action provisions have in fact been satisfied.' " Claborne v. Housing Authority of New Orleans , 14-1050, p. 8 (La. App. 4 Cir. 4/15/15), 165 So.3d 268, 278 ; see also Doe v. Southern Gyms, LLC , 12-1566, p. 14 (La. 3/19/13), 112 So.3d 822, 832-33 (finding that the general rule in favor of certifying a class does not obviate the requirement that courts conduct a rigorous analysis and take a close look at a case to determine if the statutory requirements have been satisfied). The trial court's decision should be reversed only in the event of manifest or legal error. Doe , 13-1457, p. 10, 145 So.3d at 564.
The party seeking to maintain the class action has the burden of proving that all of the statutory class certification criteria have been satisfied. La. Code Civ. P. art. 591 ; Doe , 12-1566, p. 9, 112 So.3d 822, 830 (citing Price , 11-0853, p. 9, 79 So.3d at 968 ). The burden is on the plaintiffs to make a prima facie showing "that a definable group of aggrieved persons exist[s] and that the class is so numerous that joinder is impractical." Johnson v. Orleans Parish Sch. Bd. , 00-0825, 00-0826 (La. App. 4 Cir. 6/27/01), 790 So.2d 734, 741.
In Price , the Louisiana Supreme Court reversed the lower courts' decision to certify a class of plaintiffs purportedly affected by the release of toxic chemicals from a lumber yard over a span of 66 years. The Court found that the plaintiffs had failed to prove commonality, including causation, duty, and breach.
*442 The Louisiana Supreme Court's opinion in Price repeatedly references the U. S. Supreme Court decision in Wal-Mart Stores, Inc. v. Dukes , 564 U.S. 338, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011), a putative Title VII class action brought on behalf of 1.5 million female employees of Wal-Mart for alleged discrimination in pay and promotions. In Dukes , the district court certified the class and the Ninth Circuit Court of Appeals affirmed, but the U.S. Supreme Court reversed. The Court noted that Rule 23"does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule-that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." (Emphasis supplied). Moreover, certification is proper only if, "after a rigorous analysis, the prerequisites of Rule 23(a) have been satisfied," and often the rigorous analysis "will entail some overlap with the merits of the plaintiff's underlying claim." In other words, the " 'class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.' " 564 U.S. at 351, 131 S.Ct. at 2552 (quoting General Tel. Co. of SW v. Falcon , 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) ).
In the present case, we find the class definition that plaintiffs proposed and the trial court adopted is overbroad and does not reflect the evidence in the record. That is, there is no objectively definable class as required under Article 591(A).
Moreover, in attempting to redefine the class, our rigorous review of the record reveals that plaintiffs have not met their burden of proving that this matter is appropriate for class certification because they have not shown that class issues predominate over individual issues or that class treatment is superior to joinder of individual claims under Article 591(B)(3), as discussed in more detail below.
Objectively Definable Class
"The purpose of the class definition requirement is to ensure that the class is not amorphous, indeterminate, or vague, so that any potential class members can readily determine if he/she is a member of the class." Oliver v. Orleans Parish Sch. Bd. , 09-0489, p. 13 (La. App. 4 Cir. 11/12/09), 25 So.3d 189, 200. As noted above, the trial court defined the class in this case as:
All persons who had an employment relationship with (meaning reported to work at) the building located at 2400 Canal Street ("The Annex") from 1982 to December 9, 1999 and who were exposed to toxic chemicals stored in the basement of the building at any time from August 1982 until December 9, 1999 and who suffered injury as a result of that exposure.
We find this class definition fails to account for the fact that plaintiffs have not established that "toxic chemicals" were leaking from the barrels in the basement prior to December 9, 1999.
The 1982 date specified in the class definition constitutes the date upon which the City of New Orleans began occupying the Annex. The trial court's Amended Reasons for Judgment make no factual finding regarding the beginning of the leaking of toxic chemicals. Unlike class certification cases involving mold or other uncontained toxic substances, the chemicals involved in this case were contained within barrels. With no evidence as to when the leaking began, there is no "pathway of exposure," as explained by Dr. Williams, and the class definition is overly broad and inappropriate.
*443 In Boyd v. Allied Signal, Inc. , 03-1840, pp. 11-12 (La. App. 1 Cir. 12/30/04), 898 So.2d 450, 457-58, the district court certified a class of plaintiffs who were allegedly exposed to boron trifluoride (BF3) manufactured by AlliedSignal, Inc., after the compound was released from a hole in a tube trailer traveling on Interstate 12 near Baton Rouge. The tube trailer contained 17,740 pounds of BF3 before the release, and the total amount released was 775 pounds, according to AlliedSignal's records. In Boyd , the leak occurred in a single day, and plaintiffs were able to establish the amount that leaked. Unlike Boyd , there is no evidence of what leaked, how much leaked, or when the leaking began.
Further, while the parties here agree as to the types of acidic or basic solutions contained within the barrels, and the parties evidently agree that the metal barrels containing Cecotrol, the non-acidic solution that includes sodium 2-mercaptobenzothiazole and potassium hydroxide, a base, had been leaking due to evidence of corrosion to those barrels, there is no evidence that Cecotrol is hazardous upon inhalation, and no other evidence to establish when the leaking of any toxic chemicals may have begun.[11]
Plaintiffs' expert, Patricia Williams, was qualified as an expert in toxicology and epidemiology, among other areas of study.[12] She testified that she was not asked to determine the date upon which any acid leaks began, nor did she. Dr. Williams further explained that "actual exposure" only occurs if there is a completed exposure pathway. She stated: "If we set a barrel ... that is sealed with benzene right here in this room, we do not have completed exposure pathways to exposure to benzene. If it is sealed, it is contained." Notwithstanding Dr. Williams' additional testimony related to the potential effects of acid exposure and her opinion that the complained of injuries in this case are consistent with acid exposure, there is no evidence to establish that the "exposure pathways" for any toxic chemicals were completed before December 1999.
Mr. Thomas Anderson, the lead plaintiff in this suit, testified that he smelled a "rotten egg" smell in the building when he began working at the Annex in the 1980s, but there is no fact or opinion evidence tying the rotten egg smell to the leaking of hazardous chemicals. Again, expert testimony establishes that the rotten eggs odor is the same smell that would be produced by sulphur compounds such as potassium hydroxide, a component of Cecotrol found in the metal drums located in the basement. The testimony indicates that this product, even if leaking, does not pose an inhalation hazard.
Mr. Anderson further testified that he looked in the east room within the week before the December 9, 1999 incident, but the east room at that time did not look anything like it looked after December 9, 1999, as depicted in the pictures taken by USES-testimony that suggests that there had been no leaking of corrosive acids before December 9.
*444 Dr. Paul Templet's opinion-that there "could have been" a pinhole leak in the acid-containing barrels and that the acids had been leaking "for some time"-are not supported by any additional factual evidence in the record. " 'The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound.' " Pollard v. Alpha Technical , 08-1486, p. 10 (La. App. 4 Cir. 1/28/10), 31 So.3d 576, 585 (quoting Lasyone v. Kansas City Southern Railroad , 00-2628, p. 13 (La. 4/3/01), 786 So.2d 682, 693 ).
Plaintiffs have suggested that the medical complaints of approximately 1000 claimants are sufficient to establish that toxic chemicals may have been leaking for some time, but plaintiffs cannot bootstrap their individual claims for non-specific complaints into a class action without some additional evidence to suggest when the leaking may have begun (if before December 9, 1999), which barrel or barrels of toxic chemicals may have been leaking, or how much product may have leaked.
Plaintiffs also argue that certification is appropriate because this is a "sick building," like the buildings at issue in Watters v. Dep't of Soc. Servs. , 05-0324 (La. App. 4 Cir. 4/19/06), 929 So.2d 267, and Claborne v. Housing Authority of New Orleans , 14-1050 (La. App. 4 Cir. 4/15/15), 165 So.3d 268. We disagree.
In Watters , several groups of plaintiffs sued for exposure to mold, asbestos, and other toxins in the Plaza Tower Office Building in New Orleans. In that consolidated case, the trial court certified two different classes who began working in the Plaza Tower in 1995 (the Johnson plaintiffs) or 1996 (the Watters plaintiffs). The insurer-defendant-appellant, Specialty National, argued that plaintiffs had not proven the presence of mold during Specialty National's policy period. But the trial court's findings of fact, based on evidence presented at the hearing, showed that there were numerous complaints of water leaks and sick employees as soon as the building became occupied. The trial court's class certification judgment in Watters stated: "Within weeks water pipes burst and people were ankle deep in water. Letters and memos were circulated questioning why employees were sick with nose burning, breathing difficulties, and upper respiratory problems. Numerous complaints were made to the building managers and to state supervisory personnel complaining about water leaks, ceiling leaks, dampness and buckling and wet ceiling tiles." Id. , 05-0324, p. 7, 929 So.2d at 274. Expert testimony in that case indicated that where there is water intrusion and building materials stay wet for more than 72 hours, it is more likely than not that mold spores would be produced. In addition, the evidence showed that an employee in the Plaza Tower building sent a letter in February 1997 complaining of rainwater seepage and mildew growing on the walls, plus an extremely strong smell of mildew. She also complained that the presence of mildew caused her respiratory problems.
Similarly, Claborne involved claims by approximately 3000 tenants for their exposure to mold. There, the defendant HANO's own maintenance records demonstrated that defendant were fully aware of a mold infestation but HANO failed to properly remediate the problem. This Court affirmed the trial court's certification of the class, agreeing that there is "evidentiary support" for plaintiff's burden of proving numerosity, commonality, typicality, adequacy of representation, an objectively definable class, and predominance and superiority. The trial court found that all class representatives had described visible mold in their apartments; they notified *445 defendants about water intrusion problems and mold; and they testified that the mold never went away with bleaching or repainting, among other factors. (We note that in Claborne , the trial court rejected the plaintiffs' proposed class definition as overbroad and instead restricted the definition to the date that HANO became contractually obligated to keep the housing development free of mold.
Unlike Watters and Claborne , there is no record of any health complaints or other types of complaints relating to an alleged toxic chemical leak. Moreover, several city employees reported to the east room for work each day, including the morning of December 9, 1999, and there were no complaints of a bitter or acrid smell (indicating leaking acid) before Mr. Anderson found the smoke from acid vapors. Nor was there any indication that anyone suffered injuries as a result of working in the Annex until this lawsuit was filed approximately five months later. The only indication of leaking chemicals before December 9, 1999 includes the complaints of the rotten egg smell in the building-an odor attributable to Cecotrol, a base, which presents no inhalation risk according to the evidence in the record.
Based on the testimony of Dr. Williams and Mr. Anderson, as well as the absence of any other supportable testimony to indicate that toxic chemicals were leaking before December 9, 1999; the absence of any testimony to establish the level of corrosion in the east room before December 9, 1999; and the evidence establishing that the leaking barrels containing a base do not present an inhalation hazard, we disagree that the class definition should include putative claimants who have an employment relationship with the Annex as far back as 1982.
Because we find the record devoid of sufficient evidence to establish that toxic chemicals were leaking before December 1999, the class definition enunciated in the trial court's Amended Reasons for Judgment is not appropriate. Further review of the record also shows that plaintiffs failed to prove that class issues predominate over individual issues, making class certification inappropriate. We address the remaining requirements for certification under Article 591 below.
Numerosity
Representative class members may sue if the class is so numerous that joinder of individual lawsuits is impracticable. La. Code Civ. P. art. 591. "It is important to note that this prerequisite is not based on the number of class members alone. The requirement of numerosity is followed by, and must be considered with, the core condition of this requirement-that joinder be impracticable." Doe v. Southern Gyms, LLC , 12-1566, p. 10, 112 So.3d at 830. The numerosity component is determined according to the facts and circumstances of each individual case. Id.
In Boyd , the First Circuit required the plaintiffs to "meet a threshold burden of 'plausibility' as a component element of a prima facie showing of numerosity:
[N]umerosity is not shown by mere allegations of a large number of potential claimants, or, in the case of a mass tort, by showing a certain population within a certain geographic radius or proximity of the event. In the case of a mass tort, the burden of plausibility requires some evidence of a causal link between the incident and the injuries or damages claimed by sufficiently numerous class members. This prima facie showing need not rise to the status of proof by a preponderance of the evidence, as would be necessary to prevail on the merits.
Boyd , 03-1840 at pp. 11-12, 898 So.2d at 457-58 (citing *446 Hampton v. Illinois Cent. R. Co. , 98-0430, p. 11 (La.App. 1 Cir. 4/1/99), 730 So.2d 1091, 1096 ).
Here, plaintiffs suggested that the proposed class (of people with an employment relationship to the Annex as far back as 1982) is composed of more than 1000 people. At the hearing, the testimony from plaintiffs' expert, Dr. Williams, indicated that she was given approximately 500 information sheets. Dr. Williams testified that she reviewed only the sworn surveys, which included 180 potential claimants who complained of runny nose and eyes, cough, asthma, and headaches. Dr. Williams also indicated that out of 1000 potential claimants, 144 of those claimants listed cataracts or glaucoma conditions. Because we have rejected the class definition as overbroad and also find that class certification is inappropriate on other grounds, we make no determination as to numerosity.
Commonality, Predominance and Superiority
The commonality requirement of Article 591(A) requires a showing of common questions of law and fact among the class sought to be certified. The test for commonality requires that there be at least one issue the resolution of which will affect all or a significant number of putative class members. Claborne , 14-1050, p. 9, 165 So.3d at 279 (quoting Oliver , 09-0489, pp. 10-11, 25 So.3d at 198 ). The test of commonality is not a demanding one. Watters , 05-0324, p. 15, 929 So.2d at 278.
To satisfy the requirements of Article 591(B)(3), a provision fashioned after Federal Rules of Civil Procedure Rule 23(b)(3), plaintiffs must show that common issues predominate in the action, and also show that the class action vehicle is the superior means of trying these claims. "Each subsection of Rule 23(b) overlaps significantly with the commonality requirement." WILLIAM B. RUBENSTEIN, ALBA CONTE, HERBERT NEWBERG, NEWBERG ON CLASS ACTIONS § 3:27, at 257 (5th ed. 2011). "[C]ertification ... requires that these common questions outweigh the noncommon questions in the litigation." Id. , at 258. "Given the relationship of commonality to predominance, the [U.S.] Supreme Court has reasoned that Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions.' " Id. (citing Amchem Products, Inc. v. Windsor , 521 U.S. 591, 609, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) ). Thus, even where a party has satisfied the "commonality" component required for certification, the "predominance" component of Article 591(B)(3) may be lacking.
Here, with regard to commonality, the trial court found as follows:
[P]laintiffs submitted sufficient evidence of the presence of hydrochloric and hydrofluoric acid on the premises. The testimony of the fact and expert witnesses establish that the chemicals located in the containers were the sole source of the acids. The HVAC experts differed on whether or not the ions could have been transmitted throughout the HVAC system. Nonetheless, the common source of the emission is the same for all potential class members, the acids contained in the basement. Moreover, the source resulted in the deposit of unreasonably elevated levels of toxic chemicals. This court recognizes that many of the damages may differ; however, that issue is not germane for purposes of class certification. See Price v. Martin , 2011-0853, p. 13 (La. 12/6/11), 79 So.3d 960, 970.
We agree that the common source of the emissions, if any, would be the acids contained in the basement, but because there is insufficient evidence to establish when *447 any toxic chemicals may have begun leaking (before December 1999), we disagree with the trial court's finding that "the source resulted in the deposit of unreasonably elevated levels of toxic chemicals" to the extent that this finding suggests elevated levels prior to December 1999.
Nonetheless, in addition to the "common source" of potential exposure, there is an additional common issue regarding ownership and/or responsibility for the barrels-an issue that, if resolved for one class member, can be resolved for all class members. Accordingly, we agree with the trial court that plaintiffs have satisfied the commonality requirement.
A finding of common issues of fact or law does not automatically satisfy the predominance requirement of 591(B)(3), however. In the Amended Reasons for Judgment, the trial court held:
As in Claborne, this Court finds that all of plaintiffs' claims arise from a common source, the leaking barrels, and further finds that each class member must rely on the same set of operative facts. That issue predominates over any individual issues.
Further, this Court finds that the class action device is a superior method of resolving this controversy, and that hundreds of individual liability trials would not promote judicial economy.
We find the trial court erred in determining that common issues predominate over individual issues and that the class action device is superior to joinder of similar claims. In Alexander , 11-2793, p. 3, 82 So.3d at 1236, the Louisiana Supreme Court reversed class certification after recognizing that "an entirely individualized understanding of each person's health, medical history, records, and other variables impacting exposure" would be necessary to establish liability and damages. An expert in Alexander had testified at the certification hearing that the dose of exposure to ethyl acrylic fumes that had escaped from a railroad tank car "would be impacted by important individual variables, such as the specific location of the plaintiff at the time of the exposure, and whether plaintiff moved from location to location during the exposure." Id. Another expert in Alexander testified that "the symptoms complained of by the plaintiffs, such as irritation of the eyes and nose, respiratory irritation, coughing, nausea, and vomiting, are not specific or unique to ethyl acrylate exposure, but are common symptoms with a myriad of causes." Id. Accordingly, the Supreme Court determined that '[c]ertification under these facts would create precisely the situation we cautioned against in Brooks , i.e., the class would degenerate into a series of individual trials." Id.
We find that Alexander dictates the same result in this case: class certification is inappropriate because questions of law or fact common to the members of the class do not predominate over any questions affecting only individual members. As in Alexander , the evidence of the symptoms complained of in this case-coughing and/or nose, throat, eye irritation, or other eye problems-are nonspecific systems that can be caused by many different irritants. The necessity of delving into each individual's potential rates of exposure based on his or her location in the building, personal medical history and habits, and length of time working in the Annex (if a plaintiff can indeed show that toxic chemicals were leaking before December 1999), are all critical to each claimant's cause of action and outweigh the common issues.
For example, even if a person who worked in the Annex from 1990 to 1995 proved the causation element of his tort *448 claims for damages against any of these defendants, that finding would not necessarily apply to someone who worked in the building for a different period of time or at a location much more remote from the east room in the basement. And neither of these hypothetical plaintiffs would automatically meet the causation burden even if, for example, Mr. Anderson, who was present in the building on the day of the December 9, 1999 incident, is successful in proving the causation element of his claim.
Rather than proceeding as a class, the parties may cumulate their claims under Code Civ. P. art. 463, which provides in pertinent part:
Two or more parties may be joined in the same suit, either as plaintiffs or as defendants, if:
(1) There is a community of interest between the parties joined;
(2) Each of the actions cumulated is within the jurisdiction of the court and is brought in the proper venue; and
(3) All of the actions cumulated are mutually consistent and employ the same form of procedure.
Defendants also contest the trial court's finding of superiority in this case. " 'If the superiority of a class action is disputed, the trial court must inquire into the aspects of the case and decide whether some other procedural device would better serve these goals.' " Estopinal v. Parish of St. Bernard , 13-1561, p. 18 (La. App. 4 Cir. 11/5/14), 154 So.3d 591, 604 (quoting Husband , 08-1527, p. 17, 16 So.3d at 1233 ).
Just as there is a lack of predominance, we also cannot say that certification as a class is superior to the joinder of similar claims. As this Court held in Estopinal , "[t]he myriad of factual issues, damage issues, and liability issues specific to each plaintiff, as well as each defendant, precludes the utilization of a class action as a proper procedural device." Estopinal , 13-1561, p. 18 (La. App. 4 Cir. 11/5/14), 154 So.3d at 605. Accordingly, the superiority component of certification is lacking as well.
We stress that our ruling finding no predominance or superiority is not based on the fact that plaintiffs will simply have different damages, and we make no finding as to whether plaintiffs' claims would be successful after a full trial. We also do not suggest that someone who was not present at the Annex in December 1999 is precluded from making an individual claim against these defendants. We hold simply that the individual issues here predominate over class issues, and that the class action device is not superior to joinder of the plaintiffs' claims. The requirement for certification under Article 591(B)(3) are not met.
Typicality and Adequacy of Representation
This court has determined that the typicality requirement is met "if the claims of the class representatives arise out of the same event, practice, or course of conduct that gives rise to the claims of other class members and those claims are based on the same legal theory." Watters v. Dep't of Soc. Servs. , 05-0324 (La. App. 4 Cir. 4/19/06), 929 So.2d 267, 279. Adequacy of representation requires that the proposed representatives' claims be a cross-section of, or typical of, the claims of all class members. Dupree v. Lafayette Ins. Co. , 09-0321, p. 7 (La. App. 4 Cir. 10/14/09), 41 So.3d 483. In other words, the class representatives' claims must fairly and adequately represent the interests of the class.
The trial court's Amended Reasons for Judgment in this case found:
All the claims are based on the same legal theories and arise from the presence *449 of the leaking barrels of toxic waste. Mr. Anderson and Ms. Armour worked at the Annex during the time the barrels were present and testified at the certification hearing. Both claimed to have suffered symptoms which Dr. Williams concluded were consistent with exposure to toxic waste. Symptoms included runny nose, problems with vision, coughing, headaches/migraines, along with increased chest colds and in Ms. Armour's situation, a worsening of pre-existing asthma. Further, the attorneys representing the putative class have presented more than sufficient evidence of their decades of experience in the area of class actions. Thus, this Court finds that Plaintiffs have satisfied the elements of typicality and adequacy of representation.
While we again disagree, based on the facts in the record, with the trial court's statement that "working at the Annex during the time the barrels were present " (emphasis added) is sufficient for establishing class certification, as discussed at length above, we pretermit an analysis of the typicality and adequacy of representation prongs necessary for certification because we have determined that the proposed class does not meet other requirements of Article 591.
CONCLUSION
Finding class certification inappropriate, we reverse the judgment below and remand for further proceedings consistent with this opinion.
REVERSED AND REMANDED

NID Corporation is the successor in interest to defendants Poydras Square, Inc. and New Orleans Centre Associates.

Alternatively, Pan-Am's fact witnesses claim that no such barrels would have been stored by Pan Am; additionally, Pan-Am's witnesses say that no barrels were left in the building when Pan Am sold the building to Poydras Square.
Moreover, the Chief Engineer for the City of New Orleans, John DeMajo, testified via deposition that he could not recall seeing any barrels when the City moved into the Annex in 1982. He stated, however, that the City regularly purchased chemicals for maintenance of mechanical equipment at any of the 581 mechanical plants throughout the City, including the product Deox, a product in one of the barrels in the basement that contains hydrochloric acid or muriatic acid and is used to clean evaporator and condenser coils on packaged air-conditioning units.
Ownership of the barrels in the basement of the Annex is not pertinent to the class certification issue and thus we make no factual findings in this regard.

As seen below, the record evidence establishes that the contents of the three metal barrels contained a non-acidic solution, Cecotrol.

According to the testimony of plaintiffs' expert, Dr. Templet, a "wipe test" is performed by taking a 6?x6? piece of paper and wiping a certain area, then placing the paper in water and measuring the pH of the water.

A pH of less than 7 indicates an acid, and the closer the pH value is to 1, the stronger the acid. A pH above 7 indicates a base. The higher the pH above 7, the more alkaline the base.

Poydras Square and New Orleans Centre Associates together are succeeded by defendant-appellant NID Corporation.

It does not appear that any of the named plaintiffs in this lawsuit have complained of cataracts or glaucoma.

The additional components in Cecotrol constitute proprietary information and therefore are not listed.

According to the Fire Department's records, one drum of acid was open rather than sealed. The record does not establish what kind of acid was in that drum or whether the acid in the drum was the same as the acid found on the floor in the east room on December 9, 1999.

The 16 barrels containing acid were made of plastic rather than metal. Evidence in the record established that plastic materials, unlike metal materials, are not easily eroded by acids. Thus, acids are typically sold and transported in plastic drums.

The Court also qualified Dr. Williams as an expert in the areas of hematology, neuroanatomy, medical surveillance, anatomy, medical surveillance using laboratory procedures, performance and interpretation of health assessments, and causation of environmental exposure to diseases in communities and individuals.